LARUTAN CORPORATION, APPELLANT AND CROSS-APPELLEE, V. MAGNOLIA HOMES MANUFACTURING COMPANY OF NEBRASKA, A CORPORATION, APPELLEE AND CROSS-APPELLANT, DONALD LYNCH ET AL., APPELLEES.

209 N. W. 2d 177

Filed June 29, 1973.    No. 38842.

Wright & Simmons, John F. Wright, and John F. Simmons, for appellant.

Van Steenberg, Brower & Chaloupka and Steven T. Swihart, for appellee Magnolia Homes Manuf. Co.

Lyman & Meister, for appellees Lynch.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH, McCOWN, NEWTON, and CLINTON, JJ.

McCOWN, J.

This is a declaratory judgment action brought by plaintiff, Larutan Corporation, the manufacturer and marketer of a soil compaction substance called Paczyme, against the defendant, Magnolia Homes Manufacturing Corporation, a manufacturer of mobile homes, and Donald Lynch and Herbert Ziegler, copartners, doing business as Donald Lynch Contracting Company, the local dealer of plaintiff in Scottsbluff, Nebraska. The action sought determination of whether or not plaintiff was liable to the defendants or any of them upon claims arising out of the use of the product Paczyme upon the surface of the area around the Magnolia factory. Mag-

nolia cross-petitioned against the plaintiff and the other defendants for damages, allegedly resulting from a breach of warranties in connection with the work done on the Magnolia property. The trial court entered judgment in favor of the defendant Magnolia Homes Manufacturing Corporation against the plaintiff Larutan in the sum of $16,125, and released the defendants Donald Lynch and Donald Lynch Contracting Company from any and all liability. The plaintiff Larutan Corporation has appealed and the defendant Magnolia Homes Manufacturing Corporation has cross-appealed, contending that judgment should also be entered against Lynch.

On April 28, 1969, Donald Lynch Contracting Company entered into an agreement with plaintiff Larutan to become a dealer engaged in the business of selling and applying the product Paczyme. Lynch paid to Larutan the sum of $15,000 for the area dealership. The dealer agreement provided among other things that during its term Larutan, the supplier, "will furnish to Dealer instructions on the application of Paczyme soil compaction materials * * *." The agreement also provided that the dealer "will apply such materials only in strict accordance with Supplier's terms and specifications." The agreement also provided: "Dealer agrees that he will warrant and guarantee to each of his customers the proper application of all soil compaction materials applied by him and will supply and pay for such labor as is necessary to perform all warranty obligations assumed by Dealer, including any obligations under Supplier's Warranty Agreement for materials furnished by Supplier, provided, however, there is no warranty by Supplier unless Dealer so requests on Supplier's Form F66 in accordance with its terms." The agreement also provided that the dealer was an independent contractor and not an agent of nor acting on behalf of Larutan.

Paczyme is a soil compaction substance marketed by Larutan, a Texas corporation with offices in California.

Water and Paczyme are applied to the soil with the quantities dependent upon the soil analysis and the amount of moisture in the soil at the time of application. Larutan's published promotional material states: "Paczyme is an enzymic product developed specifically for the road construction industry. It is designed for on-site stabilization of existing native soils to be used in the construction of roads, base and sub-base, fills, embankments, airfields, back fill and other surfaces requiring high densities and heavy load-bearing capacities. * * * Paczyme treated soils require a curing period of approximately 24 to 72 hours. This curing time results in the cohesion of individual soil particles. Paczyme develops a molecular attraction between soil components so that cementation occurs when the treated soil undergoes compaction. After curing, Paczyme-treated soil strongly resists the re-entry of moisture. Through a combination of cohesion, cementation, and compaction, the moisture-carrying capillaries of the treated soil become restricted, thus precluding disintegration or frost-heaving due to re-entry of moisture."

Lynch received its first supplies of Paczyme in June 1969. In the late summer and early fall of 1969, Magnolia was looking for some way to surface the area around its factory to get it out of the mud. Magnolia's manager told Lynch and his agent the areas of trouble where forklifts had bogged down in the main traffic area and the area for parking mobile homes, and where the earth was softened by water from roofs. Magnolia was told that Lynch "could stabilize the entire area probably four to six inches" in depth and make it a good hard clean surface. The Magnolia manager was given Larutan's literature showing pictures of areas that had been treated with Paczyme and was also shown a demonstration strip of Paczyme-treated surface which Lynch had put down on Avenue B in Scottsbluff. The manager relied on the literature and on the view of the demonstration strip. In addition, Lynch told him he

felt it would do the job. The manager was aware of the fact that the cost of Paczyme treatment was approximately half the cost of asphalt and that he was "taking a gamble."

In September and October 1969, Lynch submitted proposals for stabilizing the area around the Magnolia plant to a depth of 6 inches with Paczyme and seal coating with local materials. Magnolia issued its purchase order to Lynch on October 23, 1969, covering the work proposed. It was to be done "as weather permits." Lynch did not want to do the job until an engineer from Larutan could come out to advise on the mixing. Paczyme could not be used in freezing weather so the work was delayed.

In the spring of 1970, Magnolia obtained a new manager. Because of the delay, Lynch offered to let Magnolia back out. However, after viewing the demonstration strip on Avenue B and receiving Lynch's assurances that the product would do the job, and that Lynch and Larutan would stand behind it, he directed Lynch to proceed.

Soil samples were sent to Larutan in May and on May 14, 1970, Larutan sent back an analysis of them and recommended that this soil type be treated with Paczyme at the rate of 1 gallon per 26 to 31 cubic yards. In addition, Lynch was advised: "Care should be used not to exceed optimum moisture when treating this soil. The treated area should be well graded for good drainage and a surface seal should be applied."

Lynch would not do the work until a factory representative of Larutan could be present to see that it was done right. Lynch was advised by the president of Larutan that Paczyme and water, if it was applied right, would do a satisfactory job. Machinery was moved in on July 3, 1970. A Mr. Valentine, Larutan's superintendent of field operations, arrived on July 4th or 5th. Lynch or his subcontractors did the grading of the area and took soil samples to determine whether the soil was com-

pacted sufficiently to make a good subgrade. The area was prepared so that in general it drained away from the buildings. The area of the Magnolia property might be likened to an inverted saucer with the buildings toward the middle. This subgrading work was done before Larutan's engineer arrived, although there was a little dirt moved after he arrived.

Ten barrels of Paczyme containing 55 gallons each were used in the Magnolia job. Six barrels were from lot 99, two from lot PA-026, and two from lot 204-004. Around July 8, Valentine discovered that the quantity of Paczyme being used in relation to the water in applying lot 99 was wrong and they then added a half gallon of another mixture to give a better seal. Later samples of lots PA-026 and 204-004 were analyzed by testing laboratories. The results showed that lot PA-026 contained 3.40 percent solids while lot 204-004 contained 17.95 percent solids.

The job was not completed by July 12 when the plant went back into operation, but it was completed before July 21. On July 14 or 15, Mr. Valentine told Magnolia's manager that Paczyme would give them a hard surface. At that time all equipment used at Magnolia, including forklifts, were present and in operation. All parties agree that the job looked beautiful when it was completed, that it drained, and still drained at the time of trial. Although the surface sloped so that water would drain from it, there was no way on the east and an inadequate way on the west by which water could be carried away and it backed up on the property in times of heavy rain. Lynch had reinforced the area in the southwest corner with concrete because he was afraid water would stand there and had applied asphalt to a heavy-use area. Magnolia made full payment of $21,500 for the job on August 11, 1970.

About three weeks after the job was completed, two soft spots developed on the west side of the building where the plant sewer went into the ground under the

Paczyme surface. Magnolia accepted fault for this area and made its own repairs. Cracks in the surface appeared on the east side of the building in eight weeks. Repairs were made by Lynch. Water backed up on the property after the first rain and stood for one week but drained when a drainage ditch was opened by Lynch. The whole area east and west of the building started breaking up in October of 1970, after two rains and one snow. Magnolia had parked completed trailers on the surface with some of the weight resting on 2 inch pipes. The pipes broke up the surface seal immediately under it. Forklifts were also taking the seal off the top. The employees' parking lot, which constituted a little more than one-fifth of the total area treated with Paczyme, remained in good condition and was still in good condition at the time of trial which was some 2 years after the job was completed. Magnolia's evidence was that the area which broke up was in as bad or worse condition than it had been before the work was commenced.

The trial court determined that Donald Lynch Contracting Company performed its contract in a workmanlike and satisfactory manner but that the results were unsatisfactory because the product Paczyme did not conform to the implied and express warranties made by plaintiff. It also found that there was a material breach of both an implied and express warranty by plaintiff to defendant Magnolia with reference to the product Paczyme which did not meet the purposes for which it was represented and intended in this case. The court entered judgment for Magnolia against the plaintiff Larutan in the sum of $16,125 and released Donald Lynch Contracting Company and its individual partners from any and all liability.

The appellant's basic contention is that this was a declaratory judgment proceeding tried to the court without a jury, and that it therefore becomes the duty of this court to redetermine the issues of fact upon trial

de novo on the record and reach an independent conclusion without reference to the findings or conclusions of the District Court, as in equitable proceedings. Any other course, says the appellant, would be unconstitutional in view of the separate statutory provisions which, in one instance require trial de novo in this court in suits in equity; and in another, establish one form of action and abolish the distinctions between actions at law and suits in equity. See, §§ 25-101 and 25-1925, R. R. S. 1943.

Section 25-101, R. R. S. 1943, creating one form of civil action and abolishing the distinctions between actions at law and suits in equity and the forms thereof has not changed since its adoption in 1867. Section 25-1925, R. R. S. 1943, providing for trial de novo of questions of fact in equity cases in this court was first adopted in 1903. In First National Bank of West Point v. Crawford, 78 Neb. 665, 111 N. W. 587, this court said: "We do not understand that the act of 1903 * * * relative to the mode of review in this court of judgments in suits of equity, disturbs the conclusiveness of decisions of fact by juries, or by trial judges sitting in their stead, in law cases." That interpretation was recently restated in First Nat. Bank of Omaha v. First Cadco Corp., 189 Neb. 734, 205 N. W. 2d 115. This court said: "Where a law action is tried to the court without a jury, the finding of the court has the effect of a jury verdict and will not be disturbed unless clearly wrong."

Section 25-1925, R. R. S. 1943, describes the manner in which suits in equity are to be reviewed in this court and is a special statute modifying section 25-101, R. R. S. 1943. The appellant contends that Article V, section 19, Constitution of Nebraska, requires that the proceedings and practice of all courts of the same class or grade shall be uniform. That provision, however, does not require complete uniformity in all kinds of proceedings in the same court. The issue in this case is not of con-

stitutional dimensions and the appellant's contention is not well taken.

The proceeding here commenced in the form of a declaratory judgment and the cross-petition upon which judgment was actually entered was clearly in the form of an action at law for the breach of express and implied warranties. In a declaratory judgment action, issues of fact "may be tried and determined in the same manner as issues of fact are tried and determined in other civil actions in the court in which the proceeding is pending." See § 25-21,157, R. R. S. 1943. This court has treated the determination of factual issues in a declaratory judgment action which would otherwise be an action at law in the same manner as if a jury had been waived. The findings of the trial court therefore have the effect of the verdict of a jury and will not be set aside unless clearly wrong. See Belek v. Travelers Ind. Co., 187 Neb. 470, 191 N. W. 2d 819. That rule is applicable here.

Under the Uniform Commercial Code, any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise. Any description of the goods or any sample or model which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description or to the sample. See § 2-313, U.C.C.

Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is, unless excluded or modified under section 2-316, U.C.C., an implied warranty that the goods shall be fit for such purpose. § 2-315, U.C.C.

In this case there was evidence to support the assertion that express and implied warranties were made. All the direct contact with Magnolia prior to the time

the contract became effectively binding was carried on by Lynch. In the fall of 1969 and later in the spring of 1970, Lynch and its agents showed two different managers of Magnolia the demonstration installation of Paczyme which Lynch had installed on Avenue B. There is evidence that both managers relied upon their view of that sample, as well as upon the assurances of Lynch that Paczyme could do the job. The contract between Magnolia and Lynch became finally effective only after Lynch had assured Wilson, the general manager of Magnolia, that Paczyme would do it; that he would stand behind it; and Larutan would stand behind him. Wilson testified that he relied on that assurance, as well as the demonstration strip, in making the decision to have Lynch proceed. Lynch was familiar with the problems Magnolia desired to correct. He knew the use made of the property by Magnolia and the uses intended. He knew that forklifts were to be used and mobile homes were to be parked on the area. Lynch also testified that the information given him concerning the use to be made of the area upon which Paczyme was to be applied was communicated by Lynch to Larutan prior to the commencement of the job by Lynch. Three persons at Larutan assured Lynch that Paczyme, together with other ingredients properly applied, would serve the purposes outlined by Magnolia, and Larutan sent its representative to assist Lynch in performing the job.

The evidence here supports a finding that Paczyme did not conform to the implied and express warranties made by both Lynch and Larutan. It does not support a finding that Larutan alone was liable and that Donald Lynch Contracting Company and its partners were not liable to Magnolia. The trial court found that the Lynch partnership "performed its contract in a workmanlike and satisfactory manner * * *." Donald Lynch Contracting Company was not merely the contractor that performed the work, it was also the dealer which had issued express and implied warranties to Magnolia in

order to induce Magnolia to contract. Larutan's liability was primarily premised upon the conduct of Lynch but it was stipulated that Magnolia had no evidence that Lynch or the partners were agents of Larutan except for statements made by Lynch or Herbert Ziegler, partners in Donald Lynch Contracting Company. It was also stipulated that any question of indemnification between Lynch and Larutan under paragraph 11a of the dealer agreement was not to be considered in the trial.

Under the evidence here, the trial court erroneously found that neither the partnership of Donald Lynch Contracting Company nor its members were liable to defendant Magnolia Homes Manufacturing Company on its cross-petition, and erroneously released them from any and all liability. Magnolia's cross-appeal is well taken.

On the issue of damages, the trial court viewed the premises in addition to hearing the evidence. We cannot say that its determination was in error.

Judgment in favor of Magnolia Homes Manufacturing Company in the sum of $16,125 should be entered jointly against both the Larutan Corporation and defendants Donald Lynch, Donald Lynch Contracting Company, and Herbert Ziegler. The judgment against the Larutan Corporation is affirmed. The judgment releasing defendants Donald Lynch, Donald Lynch Contracting Company, and Herbert Ziegler from liability is vacated and the cause remanded with directions to enter judgment against said defendants in accordance with this opinion.

AFFIRMED IN PART, AND IN PART
REVERSED AND REMANDED.

SMITH, J., concurring.

The Legislature ought to abolish differences between law and equity actions in respect to the scope and standard of appellate review. Any difference should be one between cases tried to juries as a matter of right and other cases. Our advice to the Legislature on practice is authorized. See Art. V, § 25, Constitution of Nebraska.