THOMAS SHOTKOSKI, APPELLANT, v. STANDARD CHEMICAL
MANUFACTURING COMPANY, A NEBRASKA CORPORATION,
APPELLEE.

237 N. W. 2d 92

Filed December 18, 1975.   No. 39974.

R. Steven Geshell of Robak & Geshell, for appellant.

Finlayson, McKie & Fisk, for appellee.

Heard before WHITE, C. J., McCOWN, NEWTON, and CLINTON, JJ., and WINDRUM, District Judge.

CLINTON, J.

This is an action by the plaintiff, Thomas Shotkoski, a dairy farmer, to recover damages from the defendant, Standard Chemical Manufacturing Company, for loss of milk production and injury to dairy cows allegedly caused by feeding to the cattle a feed supplement manufactured by the defendant and sold by it to the plaintiff. The plaintiff proceeded upon theories of express warranty, implied warranty, negligence, and strict liability in tort. At the close of the plaintiff's case the defendant moved for a directed verdict on the ground that the evidence was insufficient to require submission of any of the issues, including damages, to the jury. The trial court granted the motion and dismissed the plaintiff's petition. The plaintiff appeals. We affirm.

"In reviewing the correctness of a trial court's action in directing a verdict, the party against whom the motion was directed is entitled to have the evidence, and every reasonable inference that can be drawn therefrom, construed in the light most favorable to him." Carley v. Meinke, 181 Neb. 648, 150 N. W. 2d 256. Accordingly we summarize the important parts of the plaintiff's evidence.

Plaintiff was approached by a salesman of the defendant, who suggested purchase of the supplement and stated, in the words of the plaintiff, that the "product . . . would increase our milk production." The plaintiff

purchased the supplement, which was in liquid form, along with a self-feeder. Plaintiff testified that in making the purchase he relied upon the salesman's statement that the supplement would increase milk production. The plaintiff was told by the salesman to "get the cattle started" by mixing ½ pound of the supplement with the 1½ gallons of rolled corn being given the cattle at the two daily feedings. Defendant also furnished to the plaintiff an analysis of the ration, that is, the silage and corn that was being fed to the dairy herd. The plaintiff commenced feeding the supplement mixed in the corn as instructed. The supplement was also made available to the cattle by the self-feeding device which consisted of a tank holding the liquid and four licking wheels from which the cattle could lick the supplement at a limited rate. The supplement was delivered about October 12, 1968, and was fed to the cattle by both methods for the first 2 or 3 weeks and thereafter for the balance of a 6 to 8-week period by the feeding device only. A feeding instruction label delivered with the product listed, among other things, an analysis of the ingredients and stated, "For Free-Choice Feeding." The evidence indicates that the latter term refers to feeding by the licking device. Feeding the supplement by mixture with grain is referred to as forced feeding.

After the supplement feeding had continued for about 2 weeks, milk production increased for a month and then fell off and some of the cows began drying up. Plaintiff notified defendant's salesman of the decrease in milk production at that time. The plaintiff consulted his veterinarian and the dairy herd was taken off the supplement. The supplement was analyzed and found to be as represented on the label. The veterinarian stated that in his opinion there was nothing wrong with the supplement, but that the feeding by the combination method was all wrong, and that as a consequence, some of the herd got too much urea which caused them to lose their appetites with a consequent

decrease in milk production, followed by some cows drying up. He stated that 15 to 20 percent of the herd was thus affected by the double feeding of the supplement. Once the drying up begins nothing can be done about it during that lactation cycle. Both the plaintiff and the veterinarian testified that milk production varies throughout the year, depending upon many varying factors, including the number of cows freshening, the number drying up naturally, the greening and drying of pastures, weather variations, water availability, and other factors. The plaintiff kept no production records on individual cattle, but his records do show the total number of pounds of milk sold every 2 weeks. At the time feeding of the supplement began in October of 1968, plaintiff had 64 milk-producing cows, but did not have that many in the spring of 1968. The average number of cows milked during the year 1968 is not shown by the evidence. In 1969 and 1967, the plaintiff milked an average of 40 cows.

To support his claim for damages the plaintiff introduced evidence to show that in 1968 he sold 576,149 pounds of milk and in 1969 he sold 393,537 pounds. He claims the difference between the sales price of the milk sold in the 2 years, that is, $3,903.96, as damages for loss of production.

Of the 64 cows which were producing milk on about October 12, 1968, when the feeding of the supplement began, he sold 29 at various times during 1969. He sold them because they were drying up. On February 24, 1969, he sold 11 cows for $3,245.57. On March 15, 1969, he sold 4 cows for $809.70. On April 28, 1969, he sold 3 first calf heifers for $987.98. On November 15, 1969, he sold 11 cows for $2,698.84. He testified that these 29 cows on October 12, 1968, were worth $400 each, or a total of $11,600. He claims the difference between the value on October 12, 1968, and the sales price on the various dates, or $3,857.91, as damages for injury to the cows, that is, decrease in their value because of the

loss of production on account of the feeding of the supplement. There is no expert testimony to establish that the drying of these 29 head was caused by consumption of too much urea. The veterinarian did not examine individual cattle. His testimony that 15 to 20 percent of the herd was affected was founded upon a look at the herd as a whole sometime in November of 1968.

Section 2-313(1)(a), of the Uniform Commercial Code, provides: "(1) Express warranties by the seller are created as follows: (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." Subsection (2) of section 2-313 states: "(2) It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty."

Section 2-315, U.C.C., provides that: "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."

In Larutan Corp. v. Magnolia Homes Manuf. Co., 190 Neb. 425, 209 N. W. 2d 177, we found the evidence sufficient to support a finding of both express and implied warranties where the seller and manufacturer were fully informed of the purpose for which the product (a soil stabilizer) was to be used and where they assured the purchaser that "it would do the job" and where they furnished expert assistance to assure the proper mixing of earth and stabilizer. In Larutan Corp.

v. Magnolia Homes Manuf. Co., *supra,* we said: "Under the Uniform Commercial Code, any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise. . . . Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is, unless excluded or modified under section 2-316, U. C. C., an implied warranty that the goods shall be fit for such purpose. § 2-315, U. C. C."

In the case at hand the express representation was that the milk production would be increased. There was, however, no representation as to the specific amount of increase. The agent of the defendant also gave instructions as to how the feed was to be given. In this case the plaintiff seeks recovery because the product caused a decrease in production. He does not seek to recover profits lost because production did not increase. If he had, then a different question would be here presented. We need not now attempt to solve that problem. What is clear enough, however, is that an express warranty that milk production will increase is certainly inclusive of a representation that the product will not cause a decrease. One other aspect of the warranty in this case needs to be mentioned. The evidence does not support the conclusion that any breach of warranty or damage resulting therefrom was occasioned merely by the nature of the product itself. Plaintiff's evidence supports the conclusion that the decrease in production resulted from wrong instructions about the proper way to feed the supplement, i.e., he should not have been instructed to free feed and force feed the supplement simultaneously. Reliance upon the instruction of a seller can give rise to a warranty. Texsun Feed Yards, Inc. v. Ralston Purina Co., 447 F. 2d 660,

is on point. In that case the plaintiff purchased from the defendant a supplement to increase the rate of gain in cattle in the feed yard. The sale was accompanied by instructions to feed 1.5 pounds per head per day. The plaintiff followed the advice and the weight gain slowed down considerably from what it had been before the feed was administered. It was later established that the proper dosage should have been 2 pounds per day. The court there said: "It is commercially unrealistic to treat separately the sale of the ration supplement and the rendering of professional advice and assistance. If Texsun was given inaccurate instructions by Ralston's nutrition consultant and if Texsun relied on those instructions to its economic detriment, we can perceive no reason for preventing Texsun's recovery under a breach of warranty theory." If the instructions are part of the " 'basis of the bargain' " they are relevant in determining a breach of the express warranty. Elanco Products Co. v. Akin-Tunnel (Tex. Civ. App.), 474 S. W. 2d 789.

We conclude that the plaintiff's evidence was sufficient to make a jury question on the issue of breach of both express and implied warranty.

Where the seller of goods has breached a warranty with respect thereto the purchaser may recover consequential damages proximately resulting from the seller's breach. §§ 2-714(3), 2-715(2), U. C. C. The purchaser has the burden of proving both the cause of the loss and the extent thereof. § 2-715, U. C. C., comments 4 and 5. Damages need not be proved with mathematical certainty, but the evidence must be sufficient to enable the trier of fact, in this case the jury, to estimate with a reasonable degree of certainty and exactness the actual damages. Midlands Transp. Co. v. Apple Lines, Inc., 188 Neb. 435, 197 N. W. 2d 646. It is the duty of the District Court to refrain from submitting to the jury the issue of damages where the evidence is such that it cannot determine that issue without indulging

in speculation and conjecture. Johnsen v. Taylor, 169 Neb. 280, 99 N. W. 2d 254; Midlands Transp. Co. v. Apple Lines, Inc., *supra.*

A part of the consequential damages which the plaintiff is entitled to claim is the loss in milk production which was the proximate result of the breach of warranty. Was the evidence such that the jury could determine this actual damage with a reasonable degree of certainty? The actual damage is necessarily determined by the decrease in the production of milk by the cows shown to have been affected from what it would probably have been had the injury not occurred. This damage, therefore, would clearly seem to depend upon the number of cows affected, whether all or just a part of the herd; the length of the period during which the cows would be affected, i.e., from the date of the injury to the end of the normal lactation period; and the amount by which the milk production of the cows affected would be decreased either individually or on the average. The evidence shows none of these things. Neither does it show that the herd was so managed that the average number of cows producing milk in the year 1968 was about the same as the average number producing milk in 1969, nor that the period during which production was affected corresponded to the calendar year 1969 so that it was reasonable, all other matters considered, to determine lost milk production by comparing the years 1968 and 1969.

The greatest deficiency, of course, is that the plaintiff's own evidence establishes that about 15 to 20 percent of the cattle fed the supplement suffered a substantial decrease in milk production because the supplement was fed in accordance with erroneous instructions, but does not show how long the normal lactation period of the 15 to 20 percent of cows affected would have continued. The evidence of both the plaintiff and his expert witness show many factors which may affect the production of milk and these we have already noted.

To permit the use of the differences in the total milk production figures for the whole of 1968 and the total production figures for the whole of 1969 as the measure of damages proximately caused would, under the state of the evidence, be the rankest form of speculation and conjecture.

A similar difficulty exists with reference to the claimed decrease in the market value of the cows affected by the feed. The general rule as to the measure of damages for injury to personal property which cannot be restored to its condition before the injury is the difference in the market value of the property immediately before and after the injury. Baum v. County of Scotts Bluff, 169 Neb. 816, 827, 101 N. W. 2d 455; Long & Smith v. Clapp, 15 Neb. 417, 420, 19 N. W. 467 (both cases involving damage to livestock).

The plaintiff's proof is deficient in at least two respects. First, the only competent evidence as to the number of cattle injured by the improper feeding is that of the veterinarian. His highest estimate was 20 percent, i.e., about 13 cattle were affected. There is no evidence at all to show which of the 29 cattle sold were the 20 percent affected. There is no evidence to show that the dryness in the other cattle sold was caused by the improper feeding. Secondly, the plaintiff sold the 29 cattle at various times in a period that extended from 2 to 3 months after the injury occurred, apparently sometime in November of 1968, to more than a year after the damage was noticeable. We may and do take judicial notice of the fact that the market price of cattle varies from time to time. The plaintiff testified as to the average value per head on October 12, 1968, before injury, as he was entitled to do, and such evidence was, of course, competent. Evidence of the amount for which the cattle sold is also, no doubt, some evidence of their market value on the dates sold. There is, however, no evidence whatever to establish the absence of change in market value between the date of

injury and the date the cattle were sold. Neither is there any evidence of how the injury to the cattle affected their market value either percentagewise or in any other way. As a consequence, under the evidence it cannot be reasonably determined how much of the decline in the valuation of the cattle between the date of injury and the date on which they were sold is attributable to the injury and how much to changes, if any, in market value between those dates.

The view we take on this issue makes it unnecessary for us to consider other issues raised and argued.

AFFIRMED.