SANITARY AND IMPROVEMENT DISTRICT NO. 32 OF SARPY COUNTY, NEBRASKA, APPELLANT, V. CONTINENTAL WESTERN CORPORATION ET AL., APPELLEES.

343 N.W.2d 314

Filed December 9, 1983. No. 82-666.

Robert C. Doyle of Walsh, Walentine, Miles, Fullenkamp & O'Toole, for appellant.

Thomas J. Culhane of Erickson, Sederstrom, Leigh, Eisenstatt, Johnson, Kinnamon, Koukol & Fortune, P.C., for appellee American Savings.

Clayton Byam, and Richard Croker of Croker, Huck & McReynolds, for appellee Judy Co.

James D. Sherrets of Kutak Rock & Huie, for appellees Frankson and Robertson.

Warren S. Zweiback of Zweiback, Kasher, Flaherty & DeWitt, P.C., for appellee Alexander & Alexander.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

CAPORALE, J.

In this suit for declaratory judgment plaintiff-appellant, Sanitary and Improvement District No. 32 of Sarpy County, Nebraska, seeks to have certain warrants it has issued declared invalid. The defendants who answered below, the appellees herein, are the present holders of some of those warrants. They counterclaim, seeking an order that the district levy taxes and retire their warrants. The trial court, which tried the action without a jury, dismissed the district's petition and granted the relief sought by the answering warrant holders. This appeal followed. We affirm in part and in part reverse and remand for further proceedings.

## BACKGROUND

The district was formed in 1965. By 1974 all the land within the district was owned by Continental Western Corporation and Southroads Corporation, with the exception of undivided interests in a small tract deeded to each of the members of the board of trustees of the district in order to enable them to so serve. These two corporations were effectively under the control of Antilles Corporation, which, in turn, was controlled by J. R. Swenson.

In 1973 Continental Western commenced the construction of a golf course in the Coronado Estates subdivision of the district. On May 1, 1974, the board of trustees of the district adopted a resolution of necessity empowering its chairman and clerk to enter into a contract to purchase the golf course from Continental Western. Pursuant thereto, a purchase agreement was entered into which called for the district to purchase the golf course and issue to Continental Western $350,000 in warrants as a downpayment on the purchase price. The balance of the $2,408,000 purchase price was to be paid to Continental Western as the work on the partially constructed golf course progressed. On May 2, 1974, the board of trustees approved a resolution to issue bonds in order to pay the balance of the purchase price of the golf course. The bond issue was to be handled by Hawkins Brothers, Inc., of Kansas City.

Warrants numbered 1A through 47A, totaling $350,000, were issued to Continental Western on May 7, 1974, for the downpayment. Subsequently, The Judy Company purchased warrants 19A, 20A, and 32A through 40A from Frank Hawkins, who was Continental Western's original transferee. Alexander & Alexander, Inc., purchased warrants 14A, 15A, and 16A from Continental Western. American Savings Company purchased warrants 27A through 31A from Continental Western. Roy Robertson purchased warrants 6A and 7A from Continental Western. Donald W. Frankson purchased 4A and 5A

from Continental Western. These parties gave value totaling $137,800 for the warrants, the face value of which was $185,000, were without notice of any irregularity in the issuance of the warrants, and answered and counterclaimed in the court below. They are referred to hereinafter as the "answering warrant holders."

On June 17, 1974, the Nebraska District Court, Second Judicial District, Sarpy County, entered a decree approving the bond issue and related matters concerning the construction and purchase by the district of the golf course.

In the summer of 1974 First Westroads Bank instituted foreclosure proceedings on some of the land in the district held by Continental Western. Because of this and other foreclosures on the holdings of Continental Western within the district, Hawkins Brothers was unable to sell the bonds, which had already been printed and delivered to the State Auditor's office for registration. The district did not ask Continental Western to return the warrants after it became apparent that the bond issue would fail.

All the land in the district is now owned by two banks, Metro North State Bank of Kansas City and First National Bank of Council Bluffs, the latter having acquired the Coronado Estates subdivision through foreclosure and by purchasing another bank's interest. It appears that Metro North was aware of the warrants at the time it foreclosed, or shortly thereafter, on Continental Western's holdings in the district.

On February 7, 1975, after Metro North had instituted a foreclosure on Continental Western's holdings in the district, it entered into an agreement with the district that the district would not incur any additional indebtedness without that bank's prior approval. At this time it appears that Metro North knew of the outstanding warrants. In July or August of 1979 First National took control of the board of trustees of the district. First National, through its

president who is now a trustee of the district, claims not to have had any knowledge of the $350,000 in outstanding warrants until July of 1979.

In 1980 the district instituted this suit. It appears that some of the parties named as defendants failed to answer the district's petition. They are Continental Western, William Ramsey, and J. Sig Swenson. Frank Hawkins filed an answer denying any interest in the warrants in question, and has made no appearance in this court. The trial court dismissed the district's petition as to all the parties named as defendants. Only the answering warrant holders made an appearance and filed a brief in this court.

## ISSUES

The issues presented by the district's assignments of error may be summarized as asking, (1) What is the nature of a sanitary and improvement district warrant? (2) What defenses to liability on such a warrant are available as against one who gave value and had no notice of any irregularity? and (3) What defenses are available as against a party to the transaction underlying the warrants? No arguments are presented by the district to this court as to the propriety of the trial court's direction that the board of trustees levy taxes and redeem the warrants.

## SCOPE OF REVIEW

A suit for declaratory judgment is sui generis and may involve questions of both law and equity. *Hemenway v. MFA Life Ins. Co.*, 211 Neb. 193, 318 N.W.2d 70 (1982). Issues of fact in declaratory judgment suits may be tried and determined as in other civil actions. Neb. Rev. Stat. § 25-21,157 (Reissue 1979).

An action to determine the rights and liabilities of parties to a sanitary and improvement district warrant, as with a promissory note, is an action at law, *Klitzing v. Didier, ante* p. 122, 337 N.W.2d 418 (1983), and, as such, the parties herein were entitled to a jury trial on the fact issues presented. A jury hav-

ing been waived, however, the findings of the trial court on the fact issues involved have the effect of a jury verdict and will not be set aside unless clearly wrong. *Hemenway v. MFA Life Ins. Co.*, *supra*; *Larutan Corp. v. Magnolia Homes Manuf. Co.*, 190 Neb. 425, 209 N.W.2d 177 (1973).

## NATURE OF WARRANTS
### Not Investment Securities

We first turn our attention to the nature of the warrants in question, which were issued in the following form:

SANITARY AND IMPROVEMENT DISTRICT NO. 32 OF SARPY COUNTY, NEBRASKA

NO. 5A

To: TREASURER OF SARPY COUNTY, NEBRASKA
(EX OFFICIO TREASURER OF THE DISTRICT)    DATE May 7            19 74

WARRANT

PAY TO THE ORDER OF        CONTINENTAL WESTERN CORPORATION        $ 5,000.00

**Five-thousand and no/100---------------------------------------DOLLARS

AND CHARGE TO THE        Construction        ACCOUNT OF THIS DISTRICT

THIS WARRANT SHALL DRAW INTEREST AT THE RATE OF        8        PERCENTUM PER ANNUM AFTER DATE OF PRESENTATION FOR PAYMENT

IN PAYMENT OF

EXHIBIT 23 6-2-82

CHAIRMAN

CLERK

It was not until 1976 that Neb. Rev. Stat. § 31-727(5)(d) (Reissue 1978) provided: "(5) For the purposes of sections 31-727 to 31-762, unless the context otherwise requires:

. . . .

"(d) Warrant shall mean a short-term interest-bearing order payable on a specified date issued by the board of trustees of a sanitary and improvement district to be paid from funds expected to be received in the future, including, but not limited to, property tax collections, special assessment collections, and proceeds of sale of general obligation bonds." 1976 Neb. Laws, L.B. 313.

In 1978 the following language was added to Neb. Rev. Stat. § 31-755 (Reissue 1978): "Interest on capital outlay warrants shall be represented by coupons payable to bearer attached to each warrant, but coupons shall not be issued for interest accruing after the due date of such warrant. Such coupons

shall not be deemed to be investment securities under article 8 of the Uniform Commercial Code and coupons shall always be subject to all defenses which the district may have to payment of the warrant itself. All coupons shall show on their face the number of the warrant to which they appertain and that the coupon shall not be valid for payment of any interest after the warrant has been called for redemption or redeemed. Warrant interest coupons not paid when due for lack of funds shall be registered, bear interest, and be paid the same as is provided in section 10-209 for bond coupons." 1978 Neb. Laws, L.B. 870.

In 1982, § 31-727(5)(d) (Cum. Supp. 1982) was amended to read as follows: "(5) For the purposes of sections 31-727 to 31-762, 31-735.06, and 31-771 to 31-780, unless the context otherwise requires:

. . . .

"(d) Warrant shall mean *an investment security under article 8 of the Uniform Commercial Code in the form of* a short-term interest-bearing order payable on a specified date issued by the board of trustees or administrator of a sanitary and improvement district to be paid from funds expected to be received in the future, including, but not limited to, property tax collections, special assessment collections, and proceeds of sale of general obligation bonds." (Emphasis supplied.) 1982 Neb. Laws, L.B. 868.

At the same time, § 31-755 (Reissue 1978) was amended by removing the language which read, "Such coupons shall not be deemed to be investment securities under article 8 of the Uniform Commercial Code and coupons shall always be subject to all defenses which the district may have to payment of the warrant itself." 1982 Neb. Laws, L.B. 868. The latest version of the pertinent portion of § 31-755 (Cum. Supp. 1982) reads: "Interest on capital outlay warrants shall be represented by coupons payable to bearer attached to each warrant, but cou-

pons shall not be issued for interest accruing after the due date of such warrant. All coupons shall show on their face the number of the warrant to which they appertain and that the coupon shall not be valid for payment of any interest after the warrant has been called for redemption or redeemed. Warrant interest coupons not paid when due for lack of funds shall be registered, bear interest, and be paid the same as is provided in section 10-209 for bond coupons." 1982 Neb. Laws, L.B. 868.

The answering warrant holders argue that these various legislative enactments demonstrate that the 1982 amendment of § 31-727(5)(d) merely declared what warrants had always been and what the warrants in question were when issued, namely, investment securities under article 8 of the Uniform Commercial Code.

We cannot agree. In this connection we find the district's argument persuasive, namely, that the 1978 amendment to § 31-755 was to keep the coupons, which upon detachment from a warrant become payable to bearer, from being treated differently than the underlying warrant. When in 1982 the Legislature declared warrants to be investment securities by amending § 31-727(5)(d), there was no longer any reason to treat the coupons as anything other than investment securities. We conclude, therefore, that the 1982 amendment to § 31-727(5)(d) changed the preexisting nature of warrants rather than merely declaring what they had always been.

The question remains, however, whether, notwithstanding the various forms of §§ 31-727(5)(d) and 31-755, the subject warrants are nonetheless investment securities under the language of Neb. U.C.C. § 8-102(1)(a) (Reissue 1980), which at all relevant times provided, as it does presently: "A 'security' is an instrument which (i) is issued in bearer or registered form; and (ii) is of a type commonly dealt in upon securities exchanges or markets or commonly recognized in any area in which it is issued or dealt

in as a medium for investment; and (iii) is either one of a class or series or by its terms is divisible into a class or series of instruments; and (iv) evidences a share, participation or other interest in property or in an enterprise or evidences an obligation of the issuer."

The parties hereto stipulated that the warrants in question met the requirements of subsections (ii), (iii), and (iv) above, leaving only compliance with subsection (i) at issue.

It is clear, however, that the warrants were issued payable "to the order of Continental Western Corporation," not to "bearer." "A security is in 'bearer form' when it runs to bearer according to its terms and not to [sic] reason of any indorsement." § 8-102(1)(d).

Neither are they in "registered form" as defined in § 8-102(1)(c): "A security is in 'registered form' when it specifies a person entitled to the security or the rights it evidences and when its transfer may be registered upon books maintained for that purpose by or on behalf of an issuer or the security so states."

In this latter regard we again agree with the district that the provisions of Neb. Rev. Stat. §§ 77-2201 et seq. (Reissue 1981), which require governmental treasurers to register warrants such as those in question for payment in the order of presentment as money becomes available, do not fulfill the requirements of § 8-102(1)(c) above. That section contemplates that a security is in registered form when it specifies a person entitled to the security or the rights it evidences and when its transfer may be registered upon books maintained for that purpose by or on behalf of an issuer, or the security so states. That is to say, it is in registered form when it is transferable only on the books of the issuer. See *Victory Nat. Bk., Nowata v. Oklahoma St. Bk., Vinita*, 520 P.2d 675 (Okla. 1973).

We therefore conclude that the warrants in ques-

tion fail to meet the requirements of § 8-102(1)(a)(i) and are not investment securities.

Are Negotiable Instruments

The question now becomes whether they are negotiable instruments within the contemplation of article 3 of the Uniform Commercial Code.

Since its enactment in 1963, Neb. U.C.C. § 3-104 (Reissue 1980) has provided in part: "(1) Any writing to be a negotiable instrument within this article must (a) be signed by the maker or drawer; and (b) contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power given by the maker or drawer except as authorized by this article; and (c) be payable on demand or at a definite time; and (d) be payable to order or to bearer."

The warrants are in writing, are signed by the district as the maker, and are payable to order. See Neb. U.C.C. § 3-110 (Reissue 1980), which provides that an instrument is payable to order when by its terms it is payable to the order or assigns of any person therein specified with reasonable certainty. Thus, the requirements of § 3-104(1)(a) and (d) are clearly met.

The requirement of § 3-104(1)(b) is likewise met. Neb. U.C.C. § 3-105 (Reissue 1980) has always provided in part: "(1) A promise or order otherwise unconditional is not made conditional by the fact that the instrument . . . (g) is limited to payment out of a particular fund or the proceeds of a particular source, if the instrument is issued by a government or governmental agency or unit." A sanitary and improvement district is such a governmental unit, as is contemplated by § 3-105(1)(g), under the provisions of Neb. Rev. Stat. § 31-705 (Reissue 1978), which has always stated that such a district shall be "a body corporate and politic." See, also, *Davis Management, Inc. v. Sanitary & Improvement Dist. No. 276*, 204 Neb. 316, 282 N.W.2d 576 (1979); *Hayes v.*

*Sanitary & Improvement Dist. No. 194*, 196 Neb. 653, 244 N.W.2d 505 (1976); Comment 6 to § 3-105.

The requirement of § 3-104(1)(c) is met as well. Neb. U.C.C. § 3-108 (Reissue 1980) has, at all relevant times, provided: "Instruments payable on demand include those payable at sight or on presentation and those in which no time for payment is stated." See, also, *Erickson v. Newell*, 183 Neb. 641, 163 N.W.2d 286 (1968), holding that a note which did not contain a due date was a demand note drawing interest until paid.

We conclude, therefore, that the subject warrants are negotiable instruments.

## DEFENSES

### Holders in Due Course

We next need to determine the status of the answering warrant holders. At all material times Neb. U.C.C. § 3-302 (Reissue 1980) has provided in part: "(1) A holder in due course is a holder who takes the instrument (a) for value; and (b) in good faith; and (c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person."

A holder has consistently been defined as one who is in possession of an instrument issued or endorsed to him or to his order, or to bearer or in blank. Neb. U.C.C. § 1-201(20) (Reissue 1980). Each of the answering warrant holders is in possession of warrants which had been endorsed to him or it by Continental Western or the latter's transferee. Each is therefore a holder. The question now becomes whether each is a holder in due course.

Each answering warrant holder gave value. It was stipulated that The Judy Company, Alexander & Alexander, Inc., and American Savings Company, which at various relevant times was also known as American Securities Company and American Thrift and Loan, Inc., gave value. Frankson and Robertson each testified that he gave value.

We deal with the "good faith" and "without no-

tice" requirements of § 3-302(1)(b) and (c) together, for although they are separate elements, the same set of facts at times may, as they do in this case, resolve both issues.

"Good faith" has always been defined in § 1-201(19) as honesty in fact in the conduct or transaction concerned. Whether one has taken a negotiable instrument in good faith is determined subjectively, that is to say, whether there was honesty of intent rather than the absence of circumstances which would put an ordinarily prudent holder on inquiry. *Leininger v. Anderson*, 255 N.W.2d 22 (Minn. 1977); *Frantz v. First Nat. Bank of Anchorage*, 584 P.2d 1125 (Alaska 1978); *Favors v. Yaffe*, 605 S.W.2d 342 (Tex. Civ. App. 1980); *Breslin v. New Jersey Investors, Inc.*, 70 N.J. 466, 361 A.2d 1 (1976). See, also, J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code § 14-6 (2d ed. 1980). Compare, however, *Saka v. Sahara-Nevada Corp.*, 92 Nev. 703, 558 P.2d 535 (1976), stating that bad faith may be presumed from a reckless refusal to inquire.

Under the provisions of § 1-201(25) one has at all relevant times had "notice" of a fact when "(a) he has actual knowledge of it; or (b) he has received a notice or notification of it; or (c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists. . . ."

Neb. U.C.C. § 3-304 (Reissue 1980) has listed a variety of circumstances in which a purchaser is deemed to have notice, and others which do not of themselves give the purchaser notice of a claim or defense.

We therefore analyze the evidence in light of § 3-304. It was stipulated that the purchase of the warrants by The Judy Company and Alexander & Alexander, Inc., was "without notice" of any adverse claim to, or defect in, said warrants. The former president of American Savings testified, without contradiction, that he had no knowledge as

to how Continental Western acquired the warrants purchased by American Savings, did not know the specific purpose for which they were issued, had no knowledge of any adverse claim or defense with respect to them, and, in fact, had been assured by the district's attorney that the warrants had been properly issued. Frankson testified that although he at some time served on Continental Western's board, he did not know the purpose for which the warrants he had purchased were issued, and had no knowledge of any defect or infirmity or of any adverse claim or defense against them. He, too, had been assured by the district's attorney that the warrants were "a sound investment." Robertson also served on the board at some time. He knew the warrants he had purchased were for the golf course, in connection with which he had made an inspection and had seen "pipe and all the other things." He testified he had no knowledge of any defects or infirmity in or defenses to the warrants. He also had been assured by the district's attorney that the matter had been "handled properly and [there] was nothing to be afraid of."

Under these circumstances it cannot be said the trial court was clearly wrong in concluding that the answering warrant holders took the warrants for value and in good faith. All of the requirements of § 3-302 having thus been met, the answering warrant holders are holders in due course.

One of the more important consequences of being a holder in due course of a negotiable instrument is that such a holder is not subject to certain defenses or claims which may exist between the original parties to the instrument. The rule has been set forth in Neb. U.C.C. § 3-305 (Reissue 1980) as follows: "To the extent that a holder is a holder in due course he takes the instrument free from

"(1) all claims to it on the part of any person; and

"(2) all defenses of any party to the instrument with whom the holder has not dealt except

"(a) infancy, to the extent that it is a defense to a simple contract; and

"(b) such other incapacity, or duress, or illegality of the transaction, as renders the obligation of the party a nullity; and

"(c) such misrepresentation as has induced the party to sign the instrument with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms; and

"(d) discharge in insolvency proceedings; and

"(e) any other discharge of which the holder has notice when he takes the instrument."

The district claims its obligation is a nullity because its warrants were issued in relationship with an illegal transaction. Therefore, it argues, the answering warrant holders took the warrants subject to that defense pursuant to the provision of § 3-305(2)(b).

In support of its position the district cites what it characterizes as "black letter law," which holds that contracts between municipal corporations and others which involve a conflict of interest because of employee, officer, director, or attorney relationships are void as against public policy. The district further contends that since, at the time of the golf course transaction, (1) Continental Western's attorney was also the district's attorney, (2) several members of the board of trustees of the district were employees of Continental Western, and (3) the others were subject to removal at Continental Western's desire, the transaction should be declared illegal and a nullity. We do not agree.

In 1976 the Legislature specifically provided, Neb. Rev. Stat. § 31-740 (Reissue 1978), that any purchase by a sanitary and improvement district of "public parks, playgrounds and recreational facilities so approved may be completed and shall be valid notwithstanding any interest of any trustee of the district

in the transaction." 1976 Neb. Laws, L.B. 313.

The approval referred to in the quoted portion of § 31-740 is that of either the county board or a municipality's governing body. Such approval was required by statute at the time of the golf course transaction in the present case. 1974 Neb. Laws, L.B. 629 (passed with an emergency clause, making the statute effective on March 22, 1974).

The district argues that the 1976 legislative pronouncement is evidence that the common law governing conflicts of interest in contracts with municipal corporations, which we accept for purposes of this analysis but do not decide to be as characterized by the district, was applicable to sanitary and improvement districts prior to 1976. It argues that the Legislature was not willing to change the applicability of that common-law rule until it required that an outside, independent body review the transaction. The answering warrant holders, on the other hand, argue that the 1976 legislative pronouncement was one which merely clarified a point of possible confusion.

While the district's argument on this issue is not without some logical basis, we are not convinced by it. The approval requirement was changed in 1974, some 2 years prior to the L.B. 313 additions. Moreover, the unvarnished fact of the matter is that, to a certain extent, a sanitary and improvement district is designed to be a government of, by, and for developers. The sanitary and improvement districts law, Neb. Rev. Stat. §§ 31-727 et seq. (Reissue 1978), has always contemplated that owners of land may form a sanitary and improvement district, name the board of trustees, and carry out its corporate purposes. A largely undeveloped sanitary and improvement district which consists of but one or several large landowners could not function without some amount of self-dealing. The sewer systems, streets, and other necessary improvements must be located somewhere in the district. Land for parks,

golf courses, and other recreational facilities must be purchased from someone owning land in the district. Such an owner may also be a member of the board of trustees or exert some influence upon it.

We also note that, at the relevant time, §§ 31-749 to 31-759 (Reissue 1974) required that the details of the purchase be published and provided for a hearing on any objection to the purchase, and the issuance of bonds to pay for the purchase was ultimately subject to the approval of the District Court. Although a decree of the District Court confirming the legality and validity of the bond issue does not determine the validity or invalidity of every contract made by the district in connection with the project which the bond issue was designed to finance, *Hayes v. Sanitary & Improvement Dist. No. 194*, 196 Neb. 653, 244 N.W.2d 505 (1976), there was nonetheless a mechanism for independent review of the transaction, which was utilized in this case.

We hold that a transaction between a sanitary and improvement district and an entity with which it shares common directors, officers, or attorneys need not be, on that ground alone, illegal and a nullity. Consequently, that defense, as asserted by the district, does not fall within the ambit of § 3-305(2)(b). It is therefore unavailing against the answering warrant holders who, as we have said previously, are holders in due course.

As we noted earlier, the approval provisions of § 31-740 were changed on March 22, 1974, by L.B. 629, which added the language which is bracketed in the following quoted portion: "Prior to the installation of any of the improvements provided for in this section, the plans for such improvements, other than for public parks, playgrounds and recreational facilities, shall be approved by the public works department of any municipality when such improvements or any part thereof are within the area of the zoning jurisdiction of such municipality[; Provided, that if such improvements are without the area of

the zoning jurisdiction of any municipality, plans for such improvements shall be approved by the county board of the county wherein such improvements are located], and plans and exact costs for public parks, playgrounds and recreational facilities shall be approved by resolution of the governing body of such municipality [or county]. Such approval shall relate to conformity with the master plan and the construction specifications and standards theretofore established by such municipality [or county]; Provided, where no master plan and construction specifications and standards have been established such approval shall not be required."

From our review of the record it appears that neither the district nor Continental Western was aware of this legislative action which took place a little more than a month prior to the golf course transaction. In their brief the answering warrant holders state that approval was not required at the time of the purchase. In its brief the district appears to be under the erroneous assumption that the approval changes made by the Legislature in 1974 were not accomplished until 1976. Neither in its pleadings nor in its brief does the district raise any contentions that since the approval required by L.B. 629 was not obtained, the transaction between it and Continental Western was an illegal one. On the other hand, the answering warrant holders do not contend that such approval was unnecessary because of the lack of a municipal or county master plan or construction specifications and standards.

The district has not established that the approval of a county or municipal governmental body was necessary. Lack of such approval, if it was required, may have been such a defect as to render the golf course transaction illegal and, thus, render the obligation of the district on the warrants a nullity. This type of defense would be good against a holder in due course. § 3-305(2)(b). See, also, *City of Plattsmouth v. Murphy*, 74 Neb. 749, 105 N.W. 293

(1905), 78 Neb. 163, 110 N.W. 749 (1907), voiding a public contract made in violation of a mandatory provision of a city charter requiring a prior estimate of cost and its submission to the city council.

Neb. U.C.C. § 3-307 (Reissue 1980) places the burden of pleading and proving defenses to a negotiable instrument upon the party attempting to avoid liability on the instrument. *Bank of Valley v. Mattson*, *ante* p. 596, 339 N.W.2d 923 (1983); *Columbus Bank & Trust Co. v. High Country Stable*, 202 Neb. 724, 277 N.W.2d 81 (1979). Since the district has not carried its burden in proving this defense, it is likewise unavailing against the answering warrant holders.

On the facts presented by this record it cannot be said the trial court's finding that the transaction was not illegal and a nullity was clearly wrong.

The district further argues it should not be liable on its warrants, since retention of the warrants by Continental Western after the failure of the bond issue amounted to a fraud and resulted in a conversion of the warrants by Continental Western.

In essence, these claims are contractual defenses based upon a failure of consideration or, in the worst light, a fraudulent intent by Continental Western when it entered into the golf course transaction.

It has long been the law of this jurisdiction that failure of consideration is no defense to a negotiable instrument in the hands of a holder in due course. *Farmers State Bank v. Lydick*, 112 Neb. 586, 200 N.W. 50 (1924); *Bank of Commerce & Savings v. Randell*, 107 Neb. 332, 186 N.W. 70 (1921); *Second Nat. Bank v. Snoqualmie Trust Co.*, 83 Neb. 645, 120 N.W. 182 (1909); *Blue Valley Lumber Co. v. Smith*, 48 Neb. 293, 67 N.W. 159 (1896).

It has also long been the law of this jurisdiction that although fraud in the factum is a defense as against a holder in due course of a negotiable instrument, fraud in the inducement is not. Therefore, we have held the fraud practiced upon an illiterate which induced him to believe that the instrument

signed was of some other character was a good defense as against a holder in due course. *Shenandoah Nat. Bank v. Gravatte*, 4 Neb. (Unoff.) 591, 95 N.W. 694 (1903); *Willard v. Nelson*, 35 Neb. 651, 53 N.W. 572 (1892); *First National Bank of Omaha v. Lierman*, 5 Neb. 247 (1876). On the other hand, we have held that the fraud practiced by misrepresenting the quality of a product is not a valid defense as against a holder in due course. *Broadway Bank of Kansas City v. Sager*, 122 Neb. 894, 240 N.W. 561 (1932); *Farmers State Bank v. Lydick, supra.* In *Second Nat. Bank v. Snoqualmie Trust Co., supra,* a misrepresentation concerning the ownership of personal property was held not to be a valid defense against a holder in due course. We have also held that the fraud practiced by an imposter in inducing one to endorse a negotiable instrument under a mistaken belief as to the imposter's identity is not available as a defense to a holder in due course. *Hoffman v. American Exchange Nat. Bank;* 2 Neb. (Unoff.) 217, 96 N.W. 112 (1901), *aff'd on rehearing* 2 Neb. (Unoff.) 222, 96 N.W. 112 (1902). See, also, Comment 7 to § 3-305(2)(c).

We conclude that even if Continental Western possessed a fraudulent intent with respect to its performance when entering into the golf course transaction, it would amount to no more than fraud in the inducement. Therefore, the district has no defenses to the validity of its warrants which are in the hands of the answering warrant holders.

Nonholder in Due Course

While the language of the trial court is unclear on the point, it apparently found that such warrants as may be held by Continental Western were valid, enforceable obligations of the district. With this, we do not agree.

The evidence presented at trial shows that the warrants were issued as partial payment on the contract purchase price of a golf course. Due to Continental Western's tenuous financial position, the bond

issue to finance the balance of the purchase price was unsuccessful. The district never received a golf course. Consequently, it received nothing for its $350,000 in warrants.

Failure of consideration is a valid defense against liability on a warrant in the hands of a nonholder in due course, as it is on a note. Neb. U.C.C. § 3-306(c) (Reissue 1980). See, also, *Organ Company v. Boyle*, 10 Neb. 409, 6 N.W. 473 (1880).

Statements by the answering warrant holders that the consideration given to the district in return for its warrants was the opportunity to purchase a golf course are unpersuasive. It is clear that the district was not purchasing an option by its contract with Continental Western, but a golf course. The consideration necessary to support a contract or negotiable instrument must be within the contemplation of the parties. *Schrempp v. Gallup*, 210 Neb. 415, 315 N.W.2d 248 (1982). Even if we were to accept this theory of consideration, that opportunity to purchase was destroyed by Continental Western because its actions prevented the district from exercising any right to acquire the golf course.

While it is true that the payee of a negotiable instrument may be a holder in due course, § 3-302(2), Continental Western has not achieved that status. It has given no value. Unless one has the rights of a holder in due course, he is subject to all the defenses of any party which would be available in an action on a simple contract, including failure of consideration. § 3-306; Neb. U.C.C. § 3-408 (Reissue 1980). We conclude that the trial court's finding that such warrants as may be in the hands of Continental Western are valid, enforceable obligations of the district is clearly wrong.

While it appears there may be a question as to whether the district's action against Continental Western may not have been commenced within the statutory time limitation, Continental Western did not plead to the district's petition and therefore did

not assert any limitations bar as a defense. Such a defense is an affirmative one and must be pled in order to render it available as a defense. *Bell v. Rice*, 50 Neb. 547, 70 N.W. 25 (1897); *Scroggin v. National Lumber Co.*, 41 Neb. 195, 59 N.W. 548 (1894); 54 C.J.S. *Limitations of Actions* § 354 (1948).

OTHER PARTIES

The findings of the trial court that the district's petition failed to establish any rights flowing to it from the other nonanswering defendants William Ramsey and J. Sig Swenson are not clearly wrong. Neither did the district establish it has any rights against the defendant Frank Hawkins.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED FOR FURTHER PROCEEDINGS.