RICHARD HAYES ET AL., APPELLEES, V. SANITARY AND IM-
PROVEMENT DISTRICT NO. 194 OF DOUGLAS COUNTY, NE-
BRASKA, ET AL., APPELLEES, IMPLEADED WITH DAIN, KALMAN
& QUAIL, INC., A CORPORATION, ET AL., APPELLANTS, RAY-
MOND F. BACKMAN, INTERVENER-APPELLEE.

244 N. W. 2d 505

Filed August 4, 1976.   No. 40481.

654

Warren S. Zweiback and Ray G. Breeling of Zweiback & Laughlin, for appellants.

August Ross, Daniel Dolan, and Kent Whinnery, for appellees Hayes et al.

John A. Rickerson of Rickerson & Welch, and John W. Delehant of Delehant, Croker & Huck, for amici curiae.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, NEWTON, CLINTON, and BRODKEY, JJ.

McCOWN, J.

This is a suit to recover money alleged to have been

wrongfully paid an underwriter of warrants and bonds of a sanitary and improvement district. The District Court entered judgment against the defendants Dain, Kalman & Quail, Inc., and Dain, Kalman & Quail Municipal-Nebraska, Inc., in the sum of $114,389.61, and this appeal followed.

On December 29, 1967, Sanitary and Improvement District No. 194 of Douglas County, Nebraska, was duly organized and declared to be a public corporation of this state. Sanitary and Improvement District No. 194 will be referred to hereafter as the district.

Major construction by the district included a golf course, streets, sewers, and related projects. From time to time bids were taken and contracts let for various portions of the work. As the work progressed the district paid its obligations by issuing warrants to those who performed labor or services or provided supplies. It is customary for such districts, prior to seeking bids for the construction of improvements, to contract with a financial institution to serve as fiscal agents and financial consultants.

In 1968, the district entered into such an agreement with the firm of J. Cliff Rahel and Company. That agreement provided that Rahel and Company, as agents of the district, would purchase or place at par construction fund warrants issued to contractors in connection with the installation of public improvements in the district. The warrants were to bear interest at the rate of 6 percent per annum. Rahel and Company also agreed to "purchase for our own account or sell the general obligation bonds of the District at par and accrued interest." The district agreed to pay Rahel and Company a fee equal to 5 percent of all warrants issued, and a fee of 1½ percent of all bonds issued.

During 1968 and into 1969, Rahel and Company performed services under the agreement with respect to warrants. During that time interest rates in general were climbing and the district's 6 percent warrants be-

came more and more difficult to sell. On March 4, 1969, Rahel and Company advised the district that it would no longer purchase warrants from contractors for its own account but would continue to try to place warrants elsewhere. As of June 30, 1969, J. Cliff Rahel and Company sold its assets to Dain, Kalman & Quail, Inc., of Minneapolis, Minnesota, which will be referred to hereafter as Dain-Minnesota. Rahel and Company advised the district that the contract would be assumed by Dain-Minnesota; rescinded the Rahel and Company contract with the district; and went out of business. Rahel and Company has been dismissed in this action and the amounts paid to it are not involved here.

Dain, Kalman & Quail Municipal-Nebraska, Inc., a wholly owned subsidiary of Dain-Minnesota, was formed May 26, 1969. It will hereafter be referred to as Dain-Nebraska. William J. Gourley, president of Dain-Nebraska, who had formerly been vice president of J. Cliff Rahel and Company, submitted a proposal to the district on behalf of Dain-Nebraska which was basically similar to the former agreement between the district and Rahel and Company. The proposal was dated June 9, 1969, and by its terms became effective on July 1, 1969. It was approved and accepted by the district on July 22, 1969. The agreement provided that Dain-Nebraska "will purchase or place at par as agents of your District, within 30 days after presentation to us, construction fund warrants issued in connection with the installation of public improvements in the above District. Said warrants shall bear interest at the rate of 8% per annum * * *.

"We will purchase for our own account or sell the general obligation bonds of the District at par and accrued interest."

The agreement also provided: "For services rendered and to be rendered and to defray our expenses and any discount incurred in connection with the issuance and sale or placement of warrants, the District agrees to

pay Dain, Kalman & Quail Municipal-Nebraska, Inc. a fee equal to 5% of all warrants issued after date hereof, said fee to be paid at the time of issuance of said warrants. For services to be rendered and to defray our expenses in connection with the issuance and sale of bonds, the District agrees to pay Dain, Kalman & Quail Municipal-Nebraska, Inc. a fee equal to 1½% of the amount of all bonds issued, to be paid at the time said bonds are delivered to us."

Dain-Nebraska thereafter purchased from the contractors warrants issued to the contractors and was paid $53,957.76 in warrants of the district for its fee in handling these warrants. Dain-Nebraska in turn resold the warrants to its customers. In almost all cases the sales were at par and accrued interest. The evidence does not show any profit on the resale, other than accrued interest, but Dain-Nebraska paid commissions of $25,720.06 to salesmen for the sale of the warrants.

In 1971, the district began preparing for the issuance of bonds and William J. Gourley, representing Dain-Nebraska, began conferring with representatives of the district and of the City of Omaha. On March 30, 1971, the Omaha city council had passed an ordinance annexing a major part of the district to the City of Omaha. The annexation was to take place as of July 1, 1971, and the City of Omaha agreed to assume all the district's liabilities, including the bonds to be issued by the district. In May 1971, it was agreed that the district would issue bonds in the amount of 3.7 million dollars to be dated July 1, 1971. The maturity dates ranged from July 1, 1972, to July 1, 1991, and the basic interest rates ranged from 5 to 5.6 percent. Supplemental interest coupons were also provided for, which could be detached and sold separately. The principal amount of the bonds included the $55,500 bond fee to Dain-Nebraska, which was 1½ percent of the amount of all bonds to be issued. It was also agreed that the bonds were to be sold to Dain-Minnesota at par and accrued interest. On June

15, 1971, the board of trustees of the district, by resolution, confirmed issuance of the bonds and the sale to Dain-Minnesota.

The City of Omaha approved the proposed bond issue and on June 25, 1971, the board of trustees of the district filed its petition for approval of proceedings for issuance and sale of the bonds in the District Court for Douglas County, Nebraska. On July 12, 1971, the District Court entered its decree that all proceedings required by law for the issuance of bonds in the principal amount of 3.7 million dollars by the district were legal, valid, approved, and confirmed.

Dain-Nebraska was paid the $55,500 fee as fiscal agent in connection with the sale of the bonds. Dain-Minnesota purchased the bonds and made payment, including accrued interest, on July 12, 1971, in the amount of $3,708,358.31. Dain-Minnesota sold the supplemental interest coupons from the bonds and also resold the bonds. It received $89,687.19 from the sale of the supplemental coupons and profit from the sale of the bonds themselves in the sum of $73,913.61, a total of $163,600.80.

On September 1, 1971, plaintiff Richard Hayes filed a motion to vacate and set aside the decree of July 12, 1971, validating the issuance of the bonds. The motion to vacate was overruled. Hayes then brought a separate action challenging the bond issue. After extensive pleadings, amendments, and shuffling of parties, the action reached its present form. Richard Hayes and the City of Omaha, as plaintiffs, sought an accounting to determine sums due the City of Omaha from the defendants, Dain-Minnesota and Dain-Nebraska, and J. Cliff Rahel and Company. The claims were based upon allegations that all commissions paid to the defendants under the district's agreements with them were void. The plaintiffs moved for summary judgment. The court granted partial summary judgment finding that numerous facts were established. Among those findings material here the court found that Dain-Nebraska is wholly

owned by Dain-Minnesota. There is a substantial, if not total, interlocking of officers and directors between Dain-Minnesota and Dain-Nebraska. The bonds were all purchased by Dain-Minnesota. Dain-Nebraska is a corporate shell through which Dain-Minnesota, in fact, conducted the business so that Dain-Minnesota's liability is to be measured by that of Dain-Nebraska. The commission fee of 5 percent paid to Dain-Nebraska on warrants was mutually intended to, and did, compensate Dain-Minnesota and Dain-Nebraska not only for the costs of doing business and earned profits, but also for their lending of their credit to the district.

The trial court also determined generally that without the involvement of financial institutions such as Dain-Minnesota and Dain-Nebraska, improvement district construction warrants are not worth their par value, either to the contractor entitled thereto or to prospective investors. While the district has power to tax, nevertheless, in the original development stage prospective investors will not pay par without the involvement and contribution of its credit by an outside securities firm.

Trial was held on the remaining issues in April and May of 1975. Judgment was entered October 10, 1975. Rahel and Company was dismissed on the ground that the action was barred by the statute of limitations. The court found for the plaintiffs and entered judgment in favor of the City of Omaha and against Dain-Minnesota and Dain-Nebraska in the sum of $114,389.61, with interest from July 15, 1971. This represents the combined fees for handling of both warrants and bonds. These two defendants have appealed.

The appellants and some of the amici curiae contend that the District Court proceeding which resulted in the approval of the bond issue was a final determination which precludes any collateral attack on the contract between the district and its fiscal agent. That contention rests in part upon the argument that if the fees

were illegal, then the bonds were invalid, and that issue is no longer open to challenge.

Sections 31-756 to 31-759, R. R. S. 1943, provide for the special proceedings for bond approval involved here. Those sections provide for notice and hearing and permit any person interested in the district or in the issuance or sale of the bonds to move to dismiss the petition or to answer. The statutes, in substance, provide a special proceeding in which the District Court has the power and jurisdiction to examine and determine the legality and validity of all the proceedings for the organization of the district and "all other proceedings which may affect the legality or validity of the bonds and the order of the sale and the sale thereof." The court may approve and confirm the proceedings in whole or in part or declare them illegal or invalid. In the case before us, the District Court specifically found: "The District has taken all steps and proceedings required by law for the issuance of said bonds and all of said proceedings were regularly had and are valid and should be approved and confirmed by this Court." The decree declared that all proceedings required by law for the issuance of the bonds "have been had and all required proceedings are legal and valid and are hereby approved and confirmed."

The decree also provided that after filing a transcript of the proceedings with the Auditor of Public Accounts of the State of Nebraska, and registering the bonds with the auditor and county clerk of Douglas County, the district "may issue its said bonds in the principal amount of $3,700,000, payable and bearing interest as set forth in the Resolution of the Board of Trustees adopted June 15, 1971."

The only contract between the district and either of the appellants that was referred to in the bond approval proceedings was the sale of the bonds to Dain-Minnesota at par and accrued interest. A decree in a special proceeding to determine the legality and validity of a bond

issue of a sanitary and improvement district validates the bonds and forecloses any question as to the right to issue the bonds and of compliance with any conditions precedent. See 15 McQuillin (3d Ed.), Municipal Corporations, § 43.148, p. 750.

The crux of the appellants' argument is that the decree approving the validity of the bond issue at the same time affirmed the legality and validity of any contracts with a fiscal agent or agents as to fees in connection with the issuance of any warrants which were to be paid from proceeds of the bond sale, as well as contracts for fees in connection with the sale of the bonds. The appellants' conclusion is that if the fee agreements are invalid, then the bond issue is invalid, and since the bond issue cannot be attacked because of the approval proceedings, therefore the contract for fiscal agents' fees also cannot be attacked. The conclusion does not follow.

Under the provisions of section 31-756, R. R. S. 1943, et seq., a judgment approving and confirming the legality and validity of the bond issue here is conclusive so as to protect the bonds in the hands of anyone insofar as the validity of any proceedings relating to the issuance of the bonds is concerned. See 15 McQuillin (3d Ed.), Municipal Corporations, § 43.148, p. 750. The statutes refer only to bonds, or "proceedings" which may affect the legality or validity of the bonds. The court decree confirming the legality and validity of the bond issue does not determine the validity or invalidity of every contract made by the district in connection with the project which the bond issue was designed to finance. Neither does it adjudicate collateral matters nor the validity or invalidity of fiscal agents' fees for services simply because they are to be paid from proceeds of the bond issue. See, 15 McQuillin (3d Ed.), Municipal Corporations, § 43.147, p. 747; Penn v. Pensacola-Escambia Governmental Center Authority, 311 So. 2d 97 (Fla., 1975).

The appellants also contend that the City of Omaha

is estopped from proceeding against the appellants because of its own acquiescence and actions, and because of the fact that it stands in the same position as the district because of the annexation and its assumption of liability.

The foundation of appellants' claim rests on the doctrine of equitable estoppel. Ordinarily the doctrine of equitable estoppel cannot be invoked against a municipal corporation as to the exercise of governmental functions but the doctrine will be held to apply where right and justice demand it. Talbott v. City of Lyons, 171 Neb. 186, 105 N. W. 2d 918; May v. City of Kearney, 145 Neb. 475, 17 N. W. 2d 448. Where issues of public policy are involved and where statutory requirements have been circumvented, those factors tend to outweigh possible inequitable consequences. The doctrine of equitable estoppel is not applicable here.

The appellants contend that the District Court erred in disregarding the separate corporate entities of the two appellants. Dain-Nebraska was organized May 26, 1969, and commenced business July 1, 1969. Dain-Nebraska was a wholly owned subsidiary of Dain-Minnesota. Dain-Nebraska had a total capital of $50,000, and a $500,000 line of credit with a bank. There is evidence that the main source of credit for a period of about 2 years was through the parent company. The principal business of Dain-Nebraska was to serve as a financial consultant and fiscal agent to municipalities. Dain-Nebraska technically conducted any sanitary and improvement district business of either of the two corporations in Nebraska up to and including the issuance of the bonds involved in this case. The employees of Dain-Nebraska were paid out of a payroll account of Dain-Minnesota, and Dain-Nebraska then reimbursed the parent company. The same practice was followed whenever Dain-Minnesota paid one of its salesmen for selling a security for Dain-Nebraska. Dain-Nebraska would then reimburse the parent company. There was almost

a total interlocking of officers and directors between Dain-Minnesota and Dain-Nebraska. The two corporations maintained separate books and filed separate income tax returns. For several years Dain-Nebraska was technically inactive for failure to pay occupation taxes which were insignificant in amount.

The agreement of the district for fiscal agent's services was with Dain-Nebraska. Dain-Nebraska purchased all the warrants and Dain-Minnesota purchased the entire bond issue. There is no evidence to show how Dain-Nebraska arranged for the sale of the entire bond issue to Dain-Minnesota. Neither is there any evidence as to whether any other prospective purchasers were contacted, nor is there any indication of how Dain-Minnesota entered any negotiations for the sale of the bond issue, if at all. The District Court specifically found that Dain-Nebraska was a corporate shell through which Dain-Minnesota had, in fact, conducted the business so that Dain-Minnesota's liability was to be measured by that of Dain-Nebraska.

While the general rule is that a corporation will be looked upon as a separate legal entity until sufficient reason to the contrary appears, there is sufficient evidence in the record here to pierce the corporate shell and dissipate the separate legal identities. In such cases the law has no compunction in holding a corporation liable for the acts of its owner or vice versa. In Massachusetts Bonding & Ins. Co. v. Master Laboratories, Inc., 143 Neb. 617, 10 N. W. 2d 501, we said: "The supreme court of the United States has laid down the rule which has the sanction of the authorities generally, that, where the difference between corporations is reduced to mere matter of bookkeeping, such corporations cease to have separate legal entities and will, in the interest of justice, be treated as one." The corporate fiction may be disregarded when its retention would produce injustices and inequitable consequences. Ridenour v. Kuker, 185 Neb. 321, 175 N. W. 2d 287.

"(A)ccording to a number of cases, the notion of separate corporate existence of parent and subsidiary or affiliated corporations will not be recognized where one corporation is so organized and controlled and its business conducted in such a manner as to make it merely an agency, instrumentality, adjunct, or alter ego of another corporation. The fiction of separate corporate identity of two corporations will not be extended to permit one of the corporations to evade its just obligations or to promote fraud or illegality or injustice." 18 Am. Jur. 2d, Corporations, § 17, p. 565. The evidence in the case before us is amply sufficient to support the determination of the District Court disregarding the separate corporate entities of the appellants here.

The appellants also contend that the payment by the district of a fiscal agent's fee to Dain-Nebraska for selling the general obligation bonds of the district does not constitutute a violation of the statutory restriction against the sale of such bonds at less than par value.

Section 31-755, R. R. S. 1943, dealing with the issuance and sale of such bonds provides in part: "Such bonds may either be sold by the district or delivered to the contractor in payment for the work, but in either case for not less than their par value." Dain-Nebraska's fiscal agency agreement with the district provided: "We will purchase for our own account or sell the general obligation bonds of the District at par and accrued interest." The fee was $1\frac{1}{2}$ percent of the amount of all bonds issued, to be paid at the time the bonds were delivered. The fee of $55,500 was paid to Dain-Nebraska from the proceeds of the sale of the bonds to Dain-Minnesota. There is little dispute on this record that the amount of the fee constituted a reasonable amount for services rendered. The critical issue here is whether the fiscal agent to whom the fee was paid occupied the position of a bona fide agent or was, instead, a purchaser. It is generally held that the power to sell bonds includes the power to employ a broker

or agent to effect the sale for a customary commission or fee. 15 McQuillin (3d Ed.), Municipal Corporations, § 43.64, p. 594.

Many states have statutes which, in varying language, forbid the sale of bonds at less than par. Section 31-755, R. R. S. 1943, is not unique. Generally, where the bonds are not sold to the person to whom the commission or fee is paid, the payment of such fees to one who performs fiscal services is not regarded as a sale of the bonds below par. The critical problem arises when the fiscal agent is the purchaser of the bonds. See, Annotation, Sale of municipal or other public bonds at less than par or face value, 91 A. L. R. 7. See, also, 64 Am. Jur. 2d, Public Securities and Obligations, § 244, p. 283.

15 McQuillin (3d Ed.), Municipal Corporations, § 43.67, p. 602, states: "(S)ome statutes or charters expressly or impliedly forbid the sale of municipal bonds at less than par. * * * However, such a statute does not prevent paying a broker a commission for his services in selling bonds at par, although the *purchaser* cannot be allowed a direct commission where the bonds are sold at par." (Emphasis ours.) While courts have been liberal in permitting municipal corporations to pay reasonable fees to bona fide fiscal agents, they have almost invariably treated an allowance of commissions and fees to a purchaser as a violation of the statutory prohibition against a sale at less than par. See Annotation, 91 A. L. R. 7, *supra.*

Under statutes requiring bonds to be sold at not less than par, fees and commissions paid to a purchaser have generally been held to constitute, in substance and effect, a discount in violation of law. See 15 McQuillin (3d Ed.), Municipal Corporations, § 43.67, p. 602.

In Deming v. Board of Supervisors, 237 Iowa 11, 21 N. W. 2d 19, 162 A. L. R. 391, the Iowa Supreme Court, in dealing with a similar factual situation said: "Nevertheless, the statement to the effect that a sale of bonds with a 'deduction' for a fiscal agent's fee is not a sale

at par is sound law. And the same is true of a sale of bonds with an agreement to pay the buyer such a fiscal agent's fee." See, also, City of Bay City v. Lumbermen's State Bank, 193 Mich. 533, 160 N. W. 425.

The rationale for the rule generally is that a commission paid to a buyer of the bonds is a sale at a discount. A buyer receiving a fee or commission may also keep any profit he may make on a resale while if he is an agent, the municipality is entitled to the benefit of the profit on any sale he may make. See County of Koochiching v. Elder, 145 Minn. 77, 176 N. W. 195.

In this case, Dain-Minnesota received a total profit of $163,600.80 from the sale of the bonds and the supplemental coupons. Dain-Nebraska received a $55,500 fiscal agent's fee on the bonds. The real problem stems from the obvious conflict of interest. Where a fiscal agent, acting on behalf of a municipal corporation in the issuance and sale of bonds also purchases those bonds from the municipal corporation privately, the conflict of interest is apparent. It is contrary to public policy to permit a fiscal agent who purchases bonds privately from his principal to collect, in addition, a fiscal agent's fee for sale of the bonds unless specifically authorized by statute. See, City of Miami v. Benson, 63 So. 2d 916 (Fla., 1953); 15 Business Lawyer, "Municipal Bond Buying by Fiscal Advisers," p. 393 (Jan., 1960). The record here supports that portion of the judgment dealing with the fiscal agent's bond fee.

The appellants finally contend that the fees paid by the district for purchasing and handling the construction warrants did not constitute interest payments and were not illegal. Some additional background facts are appropriate here. The evidence is quite clear that it is reasonably necessary for a sanitary and improvement district to have an agreement with a financial institution before bids on a construction project are called for in order to obtain reasonable competition and bids from prospective contractors. Contractors, in most instances,

need assurance that construction warrants can be promptly converted to cash at par before they prepare and submit bids. Many contractors will not bid without such assurance and those who are still willing to bid increase the amounts of their bids to compensate for the financial problems which may result. It is undisputed that without such financial arrangements, the cost of the improvements to the district and the public would ordinarily be greater.

The trial court in its order on partial summary judgment specifically found that without the involvement of investment firms such as the appellants, improvement district construction warrants are not worth their par value to the contractor entitled to them. The court also found that while sanitary and improvement districts have the power to tax, nevertheless, in the original development stage prospective investors will not pay par for such warrants without the involvement and contribution of its credit by an outside securities firm. Those findings are fully supported by the evidence.

In the case before us the construction fund warrants were purchased by Dain-Nebraska *from the contractors* at par. The evidence shows that almost all the warrants were then resold by Dain-Nebraska to investors at par, plus accrued interest. Warrants issued by the district to Dain-Nebraska for its 5 percent fiscal agency fee for handling warrants amounted to $53,957.76, and those warrants were also sold by Dain-Nebraska. Dain-Nebraska paid commissions of $25,720.06 to salesmen for the sale of warrants and obviously had other expenses in connection with such sales. The evidence does not establish whether any profit was made from the purchase and sale of warrants.

Section 31-755, R. S. Supp., 1969, in effect at the time of the agreement involved here, authorized the issuance of warrants by the board of trustees of the district for work completed on the project and provided: "Such warrants shall draw interest at such rate as fixed by

the board of trustees and endorsed on the warrants, but not to exceed eight per cent per annum, * * *." In 1971, the interest limitation was removed and since that time the statute has provided: "Such warrants shall draw interest at such rate as fixed by the board of trustees and endorsed on the warrants, * * *." § 31-755, R. R. S. 1943.

The District Court found that the 5 percent fee for handling warrants in the sum of $53,957.76 paid to appellants in warrants constituted interest and was illegal. The appellees contend that regardless of whether or not it be called interest, the payment of a fiscal agent's fee in connection with the handling of warrants was, in effect, the issuance of warrants at a discount and therefore illegal. The argument is that the district has no power to discount its warrants, and that the same principles which prevent bond purchasers from receiving fiscal agent's fees also prevent payment of fiscal agent's fees for the handling of warrants. We disagree.

The critical distinction between bonds and warrants here is that the bonds were purchased by the fiscal agent *from the district* while the warrants were purchased by the fiscal agent exclusively *from the contractors* to whom the district had issued the warrants. None of those warrants were discounted in any sense. The only warrants which could possibly be claimed to have been issued at a discount were the warrants issued directly to the fiscal agent in payment of its fee. The appellees' contention is that those warrants constituted an indirect discounting of contractors' warrants rather than a payment for reasonable financial services. The evidence destroys the argument.

The authorities cited by the appellees in support of the discount theory are not only ancient but they involve cases in which warrants were issued to contractors or other creditors in excess of the actual amount of indebtedness due. We find no modern precedent which logically supports the appellees' contention. The com-

paratively simple financial arrangements of the 19th century have long since been supplanted by more complicated and sophisticated financial arrangements created by the demands of a modern economic society. Generally speaking, courts have had no difficulty in finding that contracts or agreements for the performance of reasonably necessary fiscal services of benefit to a municipal corporation in connection with the issuance of its securities or the carrying out of its governmental functions are proper, at least where the fees are reasonable.

Under the fiscal arrangements for warrants involved here, the appellants agreed to place their credit on the line for the benefit of the district and of any warrant holder who chose to take advantage of it. Such arrangements generally result in increased competitive bidding and substantially reduce the overall cost of the project. The benefit accrues to the district and to the taxpaying public. It should be noted here that warrants issued by the district to a contractor may be retained by the contractor or sold to anyone he wishes. Normally they are sold to the fiscal agent. See 5 Creighton Law Rev., p. 269. The agreement of the fiscal agent financial institution simply guarantees to all contractors an immediate cash market for such warrants without any discount, if they wish to take advantage of it.

While this court has not directly passed upon the legality of financial arrangements of the sort involved here, it has noted its disapproval of a refusal to accept them. In Ledwith v. City of Lincoln, 110 Neb. 425, 193 N. W. 763, this court held: "A provision in a notice to contractors that a city reserves the option to make payment in warrants or city bonds is unenforceable, except with the consent of the contractor, and if such provision prevented competition to such an extent that it increased the cost of the work, the city should be enjoined from entering into the contract." The limitation of competitive bidding and the probable increase in

the cost of the work stemming from the possibility of contractors having to discount warrants or bonds for cash furnish the foundation for that holding.

Under section 31-733, R. R. S. 1943, the board of trustees of a sanitary and improvement district has power to carry into effect the objects for which the district was formed. That power necessarily includes the power to make contracts for the furnishing of fiscal and financial services in connection with the issuance or sale of its securities, whether those securities are bonds or warrants. Ordinarily a sanitary and improvement district may contract to pay a reasonable fee to a financial institution which will agree to purchase or place at par any construction warrants issued to contractors by the district in payment for goods or services furnished in connection with construction projects of the district. There may, of course, be circumstances under which such an agreement is neither necessary nor advisable, or there may be occasions when the amount of the fee may be unreasonable. Neither of those situations is present here.

The judgment of the District Court in the sum of $114,389.61 included fiscal agent's fees for both bonds and warrants. That judgment should be and hereby is modified to limit the judgment to the amount paid for handling bonds. Judgment is therefore directed to be entered in the sum of $55,500 against the defendants Dain-Minnesota and Dain-Nebraska, and each of them, with interest thereon from July 15, 1971, as by law provided. The remaining portion of the original judgment with respect to the handling of warrants is reversed and the cause dismissed. As so modified, the judgment is affirmed.

AFFIRMED AS MODIFIED.