NEBRASKA SECURITY BANK; and Robert L. Marisch and Teresa Marisch, individually and on behalf of others similarly situated, Plaintiffs,

v.

DAIN BOSWORTH INCORPORATED and William J. Gourley, Defendants.

CV90-0-461.

United States District Court, D. Nebraska.

Nov. 15, 1993.

Thomas Dahlk, Lieben & Dahlk, Daniel G. Doln, Omaha, NE, for plaintiffs.

Patrick B. Griffin, Kutak Rock, Omaha, NE, Peter S. Hendrixson, J. Marquis Eastwood, Dorsey & Whitney, Minneapolis, MN for defendants.

MEMORANDUM AND ORDER

KOPF, District Judge.

The defendants, Dain Bosworth Incorporated ("Dain") and William J. Gourley

("Gourley"), have moved for summary judgment, (Filing 87), as to Count 1 of the complaint dealing with the Racketeer Influenced and Corrupt Organizations Act (RICO). 18 U.S.C. §§ 1961 et seq.

The motion for summary judgment[1] will be granted in part and denied in part, as follows:

1. The motion will be denied to the extent that the court finds there is a genuine issue of fact for trial as to whether Dain and Gourley engaged in the "operation or management" of the alleged RICO enterprise;

2. The motion will be granted to the extent that the court finds the alternate enterprise consisting of Dain and its wholly owned subsidiary cannot as a matter of law constitute an "enterprise" for purposes of RICO § 1962(c);

3. The motion will be granted to the extent that the court concludes Dain and Gourley cannot be found to have conspired among themselves or with the wholly owned subsidiary for purposes of RICO § 1962(d) on the facts of this case.

### I.

Borrowing from my previous review of this case,[2] the following general background is provided.

### A.

The plaintiffs purchased from the defendant Dain[3] warrants or bonds which were issued by six separate Sanitary and Improvement Districts (SIDs). All of these SIDs were located in Nebraska.

The SIDs involved in this action are Lancaster County SID No. 7, known as "The Highlands"; Douglas County SID No. 264, known as "Autumn Heights"; Douglas County SID No. 235, known as "Escalante Hills"; Sarpy County SID No. 131, known as "Barrington Place"; Sarpy County SID No. 137, known as "Cotton Wood"; and Douglas County SID No. 257, known as "Ramble Ridge."

The SIDs at issue here were all developed between 1973 and 1984. Ultimately, the SIDS ran into financial trouble, and some of them filed for protection under the bankruptcy laws.

An SID is a limited-purpose "public corporation" formed to finance construction of public improvements within a particular area. Neb.Rev.Stat. §§ 31–727 to 31–762 (Reissue 1988). **See Neb. Sanitary & Improvement Dist. Legislation** cmt., 5 Creighton L.Rev. 269, 269 (1971–72) ("Since its humble birth in 1949 the sanitary and improvement district (SID) has steadily evolved into a highly flexible and functional vehicle for community development ... basically a governmental subdivision (a 'public corporation') formed pursuant to statute...."). As a "public corporation," an SID is vested with the power to contract for improvements, issue warrants and bonds, impose taxes, and levy assessments to pay for the warrants and bonds.

Each SID acts through a board of trustees nominated by the developer of the residential area and appointed by court order. The trustees are property owners within the SID. The SID is empowered to issue warrants to contractors, engineers, and others who in turn provide services to construct sewers, roads, water systems, and other utilities for the SID.

---

1. During oral argument on this motion, I gave Defendants leave to file an additional motion for summary judgment on the issue of the statute of limitations and on the issue of the conspiracy involving certain real estate developers and engineers. This memorandum and order should not be construed to substantively address any of those issues.

2. I gave this case considerable attention as a magistrate judge. I recommended that it be conditionally certified as a class action regarding the RICO count only and further recommended that the motion for summary judgment regarding the statute of limitations be denied. (Filing 41.) My recommendation was adopted by the district judge then assigned to the case. (Filing 43.) Thereafter, this case was assigned to me in my capacity as a district judge (proving, I suppose, that "what goes around comes around").

3. Dain owns all the stock of Dain, Kalman, Quail Municipal–Nebraska, Inc. ("DKQ–Muni"). The plaintiffs allege that DKQ–Muni served as fiscal agent and Dain as underwriter to the SIDs. (Filing 1 Compl. ¶ 8).

As its name implies, a "warrant" authorizes the treasurer of an SID to pay the holder of the warrant from the funds of the SID. When the warrant is issued, there are generally no funds available with which to pay the warrants because the subdivision is not yet marketable and there are no real estate purchasers to help pay for the improvements.

An SID is authorized to appoint a fiscal agent to oversee the sale of warrants and other securities. As the name implies, a "fiscal agent" assists the SID in the sale of its securities, including warrants. The fiscal agent is usually paid a fee for assisting in the sale of such securities.

Often the "fiscal agent" will also agree to buy the warrants from contractors who take them as payment for the improvements placed in the development by the contractors. The fiscal agent thereby becomes an underwriter as well. See, e.g., *Hayes v. Sanitary & Improvement Dist. 194*, 196 Neb. 653, 244 N.W.2d 505 (1976). "Fiscal agents" are frequently wholly owned subsidiaries of a parent corporation. The parent corporation frequently serves as an underwriter. *Id.* The underwriter sells the warrants to customers who find the warrants' tax-exempt interest attractive. Defendant Dain and its wholly owned subsidiary DKQ–Muni have served as underwriter and fiscal agent for approximately 75 SIDs.

After the improvements are completed, lots are sold to individuals who build homes or to builders who construct "spec" or custom homes. Assessments are levied against the property in the SID to repay the warrants or to establish a sinking fund for payment of a subsequent general-obligation bond issue, the proceeds of which are in turn used to pay the warrants. Both the warrants issued to provide short term financing for the development and the general-obligation bonds issued later may be good investments.

These investments provide tax-free income and often, particularly in the case of warrants, an interest rate significantly higher than the market rate for other municipal securities since an SID initially does not have an adequate tax base to pay the promised interest. Indeed, to be successful an SID depends upon the development's attracting the general public to buy the developed real estate and thereby provide a tax base to pay for the improvements.

## B.

The plaintiffs in this action are Nebraska Security Bank and Robert and Teresa Marisch. This case was conditionally certified for class-action treatment regarding the RICO count only. The plaintiffs represent all warrant holders in the six SIDs and the bondholders in SID 7. The defendant Dain (including its affiliate) served as fiscal agent and underwriter for the six SIDs. William Gourley is a former first vice president of Dain and was also an officer of DKQ–Muni. It is undisputed that Gourley was acting within the scope of his employment at all material times.

The plaintiffs allege in their complaint filed in July, 1990, that the defendants are liable to them under several theories, including: (1) a RICO theory predicated on alleged violations of 18 U.S.C. §§ 1962(c) and (d); (2) a Rule 10b–5 theory, 17 C.F.R. § 240.10b–5, promulgated under section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b); (3) a common-law theory of breach of fiduciary duty; and (4) a common-law theory of interference with contractual relations. In addition, as warrant holders of SID 257, the Marisch plaintiffs are also seeking the common-law remedy of equitable subordination because they allege that Dain received bankruptcy proceeds which were intended for the benefit of the SID 257 warrant holders.

The plaintiffs allege that the defendants engaged in a "fraudulent scheme" to sell them SID warrants and bonds which were destined for default. The defendants respond that the majority of the SIDs they have been involved with have been successful, and there was no such fraudulent scheme in this case.

Boiled down to its essence, the complaint alleges a fraud founded upon two components: (a) that by virtue of its relationship as fiscal agent, and later underwriter, to the SIDs and by virtue of its relationship to the

plaintiffs as broker (in effect seller), Dain[4] sold SID warrants and bonds, omitting[5] to tell the purchasers that the securities "were predestined for default," (Filing 1 Compl. ¶¶ 16–22), and (b) that Dain used the bankruptcy laws to shield itself from liability by participating in the bankruptcies of some SIDs, which bankruptcies served to divert the attention of the purchasers of the debt instruments. (Filing 1 Compl. ¶¶ 56–58 & 69.)[6]

Plaintiffs also allege that Defendants engaged in a scheme to conceal their fraud and lull the investors into complacency by representing to the investors that "Dain would protect their interest in bankruptcy proceedings and closely monitor the proceedings" in an effort to minimize investor "fallout." (Filing 1 Compl. ¶ 69.) Thus, according to Plaintiffs, not only were the inevitable bankruptcies a component of the fraud, but Dain also actively concealed the fraud by promising to look after the interests of the investors in the bankruptcies.

## II.

Plaintiffs have alleged a substantive RICO violation pursuant to 18 U.S.C. § 1962(c)[7] and a RICO conspiracy under 18 U.S.C. § 1962(d).[8] It is in regard to these claims that Defendants have submitted their motions for summary judgment.

Before addressing those issues, however, it is appropriate to restate, albeit briefly, the legal principles governing summary judgments. In ruling on a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106

S.Ct. 2505, 2521, 91 L.Ed.2d 202 (1986). However, the nonmovant cannot rest on the pleadings when confronted with an otherwise well-founded motion for summary judgment, but must present sufficiently probative admissible evidence to establish that genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

## A.

Under RICO § 1962(c), Plaintiffs have alleged alternative "enterprises" which Defendants purportedly conducted through a pattern of racketeering activity, to wit: the SIDs or an association-in-fact comprised of Dain and its wholly owned subsidiary. Defendants make two arguments in support of their motion for summary judgment related to the RICO "enterprises."

First, based upon *Reves v. Ernst & Young*, ─── U.S. ───, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), Defendants argue that the evidence falls short of establishing that they had sufficient control of the SIDs and, therefore, Plaintiffs cannot establish that Defendants conducted the affairs of the SIDs as the RICO "enterprise." Second, Defendants argue that as a matter of law the RICO "enterprise" cannot be the purported association-in-fact of Dain and its wholly owned subsidiary. I disagree with Defendants' first argument, and agree with their second.

## 1.

In *Reves, supra*, the Supreme Court functionally defined the terms "conduct" and "participate" found in 18 U.S.C. § 1962(c). Section 1962(c) makes it unlawful for any person "employed by or associated with any

---

4. For purposes of discussion, I shall refer to the defendants collectively as Dain, except as otherwise indicated in the text.

5. Plaintiffs' counsel has conceded that for purposes of the fraud allegations this is an omissions case, rather than a misrepresentation case, at least for the purposes of section "b" of Rule 10b–5. (Filing 33 Tr. 42:7–43:12.)

6. I will defer consideration of the defendants' First Amendment defense until I consider the statute-of-limitations question.

7. Section 1962(c) states:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

8. Section 1962(d) states: "It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section."

enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...."

The Court ruled that an accounting firm's preparation of financial statements for a corporation which was said to be the RICO enterprise, and its failure to tell the corporation's board of directors about the questionable valuation of a critical asset, were not sufficient to hold the accountants liable under § 1962(c) because such activity did not amount to "operation or management" of the corporation. *Reves,* — U.S. at ——, 113 S.Ct. at 1174.

The Court indicated that the term "conduct" necessarily implies some degree of direction over the enterprise's affairs. *Id.* —— U.S. ——, 113 S.Ct. at 1170. The Court further indicated that the term "participate" means that one must play some part in directing the enterprise's affairs. *Id.* As the Court said, "RICO liability is not limited to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required." *Id.* (emphasis in original). The Court specifically disagreed with the suggestion that § 1962(c) requires "significant control." *Id.* —— U.S. at —— n. 4, 113 S.Ct. at 1170 n. 4.

■ There is evidence that Defendants had some operational or management control over the SIDs to a degree sufficient to overcome the motion for summary judgment. For example, there is evidence in the record regarding SID 131 that: (1) Dain or its subsidiary had the contractual right (a) to approve or withhold approval for contracts related to installation of subdivision improvements which were to be financed by warrants; (b) to control when, in what amount, and at what interest rate bonds would be issued; (c) to control at what rate warrants would bear interest and to "place" such warrants "at such times and in such amounts as we determine"; and (d) to serve as "paying agent," meaning that Dain had the right to

draw upon the funds of the SID for payment of principal and interest on warrants; (2) Dain exercised its contractual right to change the rate of interest on warrants; (3) as a condition of bidding, a contractor sought Dain's assurance that it would pay SID warrants issued for payment of the improvements, and Dain gave its assurance; (4) Dain obtained the federal tax identification number, for the SID; and (5) Dain filed a tax return for the SID. Plaintiffs argue that this evidence is typical of all the SIDs. Defendants do not dispute the point, but rather contend that this evidence is simply typical of municipal-bond financing.

Specifically, Defendants argue that they are like the accountants in *Reves;* that is, Defendants assert that they are merely financial advisors who did not control the SIDs. Allowing Plaintiffs the inferences due at this stage of the proceedings, I disagree.

This case particularly involves the claim that Dain sold warrants it knew were destined for default. By possessing and exercising the right to control the interest rate on the warrants, Dain, not the SIDs, controlled whether the warrants were marketable. The decision regarding what rate of interest a corporation is willing to pay on its securities is central to the operation or management of the corporation. Thus, when control of the rate of interest the warrants would pay was shifted from the trustees of the SIDs to Dain, and Dain exercised that control, I believe the test set forth in *Reves* was satisfied.

■ Defendants further argue that Plaintiffs must prove "undue means" such as bribery to gain control. (Defs.' Mem. at 13.) I disagree. Rather, I believe that Plaintiffs are required to establish "some" control over the RICO enterprise, regardless of whether such control is acquired legally or otherwise.[9] While the Supreme Court stated that a person associated with the enterprise could control the enterprise through "bribery," —— U.S. at ——, 113 S.Ct. at 1173, this statement was meant as an "example, albeit not as

9. Of course, in order for Plaintiffs to prevail at trial, they must not only establish sufficient operation or management control, but also that the control was thereafter exercised through a pattern of racketeering activity. The two questions

should not be confused. The question of whether one has sufficient control of an enterprise is different from the question of whether, assuming sufficient control, one exercised that control through a pattern of racketeering activity.

a limitation." *Fidelity Fed. Sav. & Loan Ass'n v. Felicetti*, 830 F.Supp. 257, 259 (E.D.Pa.1993). That Dain's control of the SIDs' securities was facially lawful does not detract from the fact of control.

In sum, allowing Plaintiffs the appropriate inferences for purposes of summary judgment, because Dain apparently had control over the marketability of the tax exempt securities issued by the SIDs, particularly having and exercising control over the rate of interest the SIDs would pay on their warrants, a genuine issue remains for trial as to whether Dain engaged in the "operation or management" of the alleged RICO enterprise.

### 2.

■ Plaintiffs have alleged an alternative to the SIDs as the RICO enterprise under § 1962(c), and that alternative is an association-in-fact between Dain and its wholly owned subsidiary. Such an association-in-fact is not distinct from Defendants, and thus may not be considered an "enterprise."

■ Section 1962(c) prohibits any "person employed by or associated with" any "enterprise" from conducting or participating in the "conduct of such enterprise's affairs through a pattern of racketeering activity." The "person" must be distinct from the "enterprise" or one would be confronted with the anomalous situation of a "person" violating § 1962(c) by conducting his or her own affairs through a pattern of racketeering activity, a result at odds with the text of the statute. *Atlas Pile Driving v. DiCon Fin.*, 886 F.2d 986, 995 (8th Cir.1989) (Section 1962(c) "has been interpreted as requiring that the person named as the defendant cannot also be the entity identified as the enterprise.").

How, indeed, could a "person" (whether a human being or a corporation) be "employed by or associated with" himself, herself or itself? To ask the question is to answer it.

■ This simple point—that for purposes of § 1962(c) a "person" must be distinct from the "enterprise" because the statute makes no sense linguistically if otherwise interpreted—has been sensibly extended to situations involving a parent corporation and its wholly owned subsidiary corporation. Thus, a number of courts have held that in cases involving no more than a parent corporation and its wholly owned subsidiary, such entities cannot together or alone form a RICO enterprise for § 1962(c) purposes when one or both are also the defendant "person" because a parent corporation and a wholly owned subsidiary are, from an economic perspective, one and the same. See, e.g., *Glessner v. Kenny*, 952 F.2d 702, 710 (3rd Cir.1991); *Odishelidze v. Aetna Life & Casualty*, 853 F.2d 21, 23–24 (1st Cir.1988); *NCNB Nat'l Bank of North Carolina v. Tiller*, 814 F.2d 931, 936 (4th Cir.1987), *overruled on other grounds, Busby v. Crown Supply*, 896 F.2d 833 (4th Cir.1990) (distinguishing between § 1962(a) and (c)).[10]

The Supreme Court recognized in the context of Section 1 of the Sherman Act that a wholly owned subsidiary is not different from its parent in any meaningful economic sense:

> A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver.

**10.** Nor can an employee who simply acts within the scope of employment be considered distinct from his or her corporate employer inasmuch as corporations can only act through their employees. See, e.g., *Glessner*, 952 F.2d at 711–14; *Atkinson v. Anadarko Bank & Trust*, 808 F.2d 438, 441 (5th Cir.1987). In this case, it is an undisputed fact that Gourley was acting within the scope of his employment at Dain and DKQ–Muni, and was acting on behalf of his corporate employers. In fact, Plaintiffs have pled that the "pattern of racketeering activity was adopted and ratified by managerial officers of Dain, and the acts were performed in furtherance of Dain's interests and policies." (Filing 1 Compl. ¶ 75.) Consequently, Gourley is the same "person" as defendant Dain for purposes of determining whether the association-in-fact is separate from the "person" under § 1962(c). *Glessner*, 952 F.2d at 712. Thus, if the relationship between Dain and DKQ–Muni will not establish an "enterprise" separate from Dain as the "person," the addition of Gourley as a "person" does not alter the situation.

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771, 104 S.Ct. 2731, 2741–42, 81 L.Ed.2d 628 (1984) (holding that a parent and wholly owned subsidiary cannot conspire under Section 1 of the Sherman Act).

The plaintiffs, however, rely upon *Haroco, Inc. v. Am. Nat'l Bank & Trust,* 747 F.2d 384, 402 (7th Cir.1984), *aff'd on other grounds,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). In *Haroco,* the Seventh Circuit summarily concluded that ''a subsidiary corporation is certainly a legal entity distinct from its parent,'' and, thus, ''since the defendants do not challenge this point,'' a complaint which alleged that the wholly owned subsidiary was the person and the parent the enterprise was sufficient under § 1962(c). *Haroco,* 747 F.2d at 402.

I do not find the reasoning of the Seventh Circuit persuasive. First, the issue the court decided was not contested by the defendants; thus, there is reason to doubt that the court had the benefit of a fully briefed argument on the point. Second, the court's analysis is extremely brief, consisting of one sentence: ''The subsection [§ 1962(c)] requires only some separate and distinct existence for the person and the enterprise, and a subsidiary corporation is certainly a legal entity distinct from its parent.'' *Id.* at 402. This conclusory statement is little more than a truism.

The closest the Seventh Circuit comes to explaining itself is in a discussion of *Copperweld.* The *Haroco* court recognized in a footnote the self-evident proposition that RICO and Section 1 of the Sherman Act have different purposes. Thus, the Seventh Circuit reasoned that *Copperweld* is not applicable in the RICO context. *Haroco,* 747 F.2d at 403 n. 22. Specifically, the court believed that since one of the purposes of RICO is to get at illicit profits, it was perfectly acceptable to ignore the teaching of *Copperweld.*

However, the Seventh Circuit's distinction does not make a difference. There is simply no reason to assume that the actions of a parent and a wholly owned subsidiary are more (or less) likely to generate illicit profits through a violation of § 1962(c) of RICO than the actions of two divisions of the same corporation. Thus, if one corporation operat-ing as two divisions cannot constitute a "person" and an "enterprise" under a fair reading of § 1962(c), a point the *Haroco* court implicitly recognized, 747 F.2d at 402 ("ANB may not be held liable under section 1962(c) for conducting its own affairs"), there is no reason to assume that the statute is properly construed to cover the same functional entity operating as a parent and a wholly owned subsidiary.

The Eighth Circuit Court of Appeals has not specifically addressed the question of whether a parent corporation and its wholly owned subsidiary alone or together can form a RICO "enterprise" where one or both of them are a defendant "person" alleged to have engaged in the racketeering activity. It is my belief that the court of appeals would follow the majority of circuit court opinions addressing the issue and conclude that a parent corporation and its wholly owned subsidiary cannot alone or together constitute an "enterprise" for purposes of § 1962(c) when one of them is named a defendant "person."

Plaintiffs point to *Atlas Pile Driving,* 886 F.2d at 995, suggesting that the "Eighth Circuit has expressly held [in *Atlas*] that corporations may be considered capable of forming an association-in-fact for purposes of RICO." (Pls.' Mem. Br. at 16.) While *Atlas* does hold that related legal entities which are named as defendant "persons" may also comprise *part* of an "enterprise," *Atlas* most certainly does not hold that related entities—such as a parent and its wholly owned subsidiary—can *alone* constitute an enterprise where one or both are named a defendant "person."

In *Atlas Pile Driving,* the circuit court examined a RICO enterprise consisting of five entities, where two of the entities were named as defendants. One of the defendants was a corporation which owned the other defendant, a partnership. The scheme in *Atlas* allegedly began when a real estate development corporation (LMH), owned by Conry, sold land to a general contractor (CACC or Stroth) financed by a first mortgage from a lender (DiCon). The real estate development corporation (LMH) controlled by Conry owned 99 percent of the lender (DiCon). The general contractor (CACC or

Stroth) promised to pay subcontractors despite the fact that the general contractor's expenses exceeded available capital. Subcontractors were thus induced to invest their time and materials in the building project. Only one subcontractor (AES) was paid by the general contractor, and that one subcontractor was owned by Conry. Anderson, an employee of the subcontractor which was paid (AES), also owned the general contractor (CACC or Stroth). There was no claim that Anderson was acting within the scope of his employment at AES when he operated CACC or Stroth. When the general contractor (CACC or Stroth) failed, the lender (DiCon) foreclosed its first mortgage and the unrelated subcontractors were left "holding the bag," as the general contractor was judgment proof.

The unrelated subcontractors later sued, naming the real estate developer (LMH) and the lender (DiCon) as defendants. The subcontractors contended that the "enterprise" consisted of the real estate developer (LMH), the lender (DiCon), the general contractor (CCAC or Stroth), and the fully compensated subcontractor (AES). The unpaid subcontractors prevailed at trial. On appeal, the defendants argued that the "enterprise" was not distinct from the "person" because two of the "persons" were also defendants. The court of appeals rejected that argument, noting that a "collective entity is something more than the members of which it is comprised." *Id.* at 995.

In *Atlas,* the economically related members of the group controlled by Conry (LMH, DiCon, and AES) needed the members of the group controlled by Anderson (CACC or Stroth) for the "enterprise" to succeed. Specifically, a general contractor was needed which would fail. In this sense, the Conry group of named defendant "persons," which were related corporate and partnership entities (LMH and DiCon), was distinct from the "enterprise" because the "enterprise" included the general contractor (CACC or Stroth) and the general contractor was owned by Anderson. Since the Anderson group was economically distinct from the Conry group, and the members of the Anderson group were not named as defendant "persons," there was a sufficient distinction between the "persons" who abused the "enterprise." In the words of the court of appeals, the "collective entity" or "enterprise" was "something more" than the defendants. *Id.*

From this explanation, it is clear that *Atlas* does not support Plaintiffs' position in this case. If anything, *Atlas* tends to support the position of the defendants that there must be a substantive economic difference between the named "person" defendants and the "enterprise."

In summary, because the facts are not in dispute and a parent corporation and its wholly owned subsidiary cannot alone constitute the "enterprise" when the parent is also the defendant "person," the motion for summary judgment must be granted as to the alternative-enterprise theory.

**B.**

 Regarding the conspiracy alleged under RICO § 1962(d), Defendants argue as a matter of law that they cannot conspire among themselves or with the Dain affiliate DKQ–Muni. Given the facts of this case, I agree that Defendants cannot conspire among themselves or with DKQ–Muni, the wholly owned subsidiary, to violate RICO.[11]

Plaintiffs have pled that the "pattern of racketeering activity was adopted and ratified by managerial officers of Dain, and the acts were performed in furtherance of Dain's interests and policies." (Filing 1 Compl. ¶ 75.) It is undisputed that Gourley was at all times acting within the scope of his employment. Moreover, there is no pleading or proof that DKQ–Muni was specifically set up to perpetrate fraud. It is also an undisputed fact that Gourley was an officer of both Dain and DKQ–Muni. Thus, as a matter of fact, it is undisputed that whatever the subsidiary (DKQ–Muni) and the employee (Gourley) did, such actions were authorized and adopted by,

---

11. A different situation might be presented if I were confronted with a corporate subsidiary not wholly owned by the parent, with two corporate employees said to have conspired, or with a corporate employee who was not acting within the scope of employment on behalf of the corporate employer. I have no occasion to consider such questions.

and done on behalf of, one economic unit—Dain. With these facts in mind, I turn to the question of law.

■ Normally, a parent corporation cannot conspire with its wholly owned subsidiary. *Copperweld,* 467 U.S. at 777, 104 S.Ct. at 2744 (Section 1 of the Sherman Act);[12] *Pink Supply Corp. v. Hiebert,* 788 F.2d 1313, 1316 (8th Cir.1986) (Section 1 of the Sherman Act). This principle has been applied to RICO conspiracy actions. *Satellite Fin. Planning v. First Nat'l Bank,* 633 F.Supp. 386, 405 n. 23 (D.Del.1986) (wholly owned and nearly wholly owned subsidiaries "can conspire in violation of RICO no more than they could for antitrust purposes under *Copperweld* ").

■ In a similar vein, an employee acting within the scope of his or her employment is normally found to be incapable of conspiring with the corporate employer. *Pink Supply Corp.,* 788 F.2d at 1316; *Cross v. Gen. Motors,* 721 F.2d 1152, 1156 (8th Cir.1983) (civil rights). This principle has been applied in the RICO conspiracy context. *Palmer v. Nationwide Mut. Ins.,* 945 F.2d 1371, 1376 (6th Cir.1991) (officers and directors of corporations are not ordinarily deemed at law to be conspirators with employing entity for purposes of RICO). Accord *Hughes v. Technology Licensing Consultants,* 815 F.Supp. 847, 851 (W.D.Pa.1992); *Colonial Penn Ins. v. Value Rent–A–Car,* 814 F.Supp. 1084, 1096–97 (S.D.Fla.1992); *Northeast Jet Ctr. v. Lehigh–Northampton,* 767 F.Supp. 672, 684–85 (E.D.Pa.1991); *U.S. Concord v. Harris Graphics,* 757 F.Supp. 1053, 1060–61 (N.D.Cal.1991); *Helman v. Murry's Steaks,* 742 F.Supp. 860, 883 (D.Del.1990). But see *Bowman v. Western Auto Supply,* 773 F.Supp. 174, 179–80 (W.D.Mo.1991) (collecting cases), *rev'd on other grounds,* 985 F.2d 383 (8th Cir.1993).

Although the United States Court of Appeals for the Eighth Circuit has not yet applied these principles to the RICO conspiracy context, I believe the court would do so. A contrary result would promote structure over reality.

As might be expected in an area of law that is complex, Plaintiffs are not without support for their position. While I am not persuaded by the cases, two of the opinions cited by Plaintiffs warrant discussion.

The first case is from the Third Circuit. Although the Third Circuit has never squarely confronted the issue, it has implied that a complaint which alleges a RICO conspiracy involving a parent and a subsidiary will withstand a motion to dismiss if it is pled that the subsidiary "was established solely for the purpose of perpetrating securities fraud." *Glessner, supra,* 952 F.2d at 714 (discussing *Shearin v. E.F. Hutton Group,* 885 F.2d 1162, 1166–67 (3d Cir.1989), and affirming the district court's dismissal of the complaint).

In this case, there is no claim or evidence that DKQ–Muni was "established solely for the purpose of perpetrating securities fraud." As a matter of historical fact, it appears that DKQ–Muni was lawfully formed in 1969 to purchase the assets of J. Cliff Rahel and Company. *Hayes v. Sanitary & Improvement Dist. 194,* 196 Neb. at 655–56, 244 N.W.2d at 507–08 (discussing the formation of DKQ–Muni). It would therefore be impossible to honestly allege that DKQ–Muni was established solely for the purpose of perpetrating the fraud in this case because the subsidiary was created long before the fraud here is alleged to have taken place and it was lawfully formed to acquire the assets of another business.

In any event, I do not believe the Third Circuit has directly ruled on the question of

12. A majority of the justices in *Copperweld* doubted that intracorporate conspiracies were recognized at common law at the time the Sherman Act was adopted. 467 U.S. at 775 n. 24, 104 S.Ct. at 2744 n. 24 ("[I]t is far from clear that intracorporate conspiracies were recognized at common law in 1890."). The notion of intracorporate conspiracies began to develop in the late 19th and early 20th centuries. *Id.* By 1984, "[e]ven today courts disagree whether corporate employees can conspire with themselves or with the corporation for purposes of certain statutes, such as 42 U.S.C. § 1985(3)." *Id.* (citations omitted). Thus, there appears to be little or no common-law tradition supporting an argument that a parent corporation can conspire with its wholly owned subsidiary or that an employee, acting within the scope of his or employment, can conspire with the corporate employer.

whether a parent and a wholly owned subsidiary can be held to have conspired for RICO purposes. In *Glessner* and *Shearin,* the Third Circuit was discussing how conspiratorial agreements must be pled, not whether a parent and a subsidiary could conspire in the abstract. Accordingly, I do not believe either *Glessner* or *Shearin* supports Plaintiffs' position.

In support of their position, Plaintiffs also cite the Seventh Circuit's decision in *Ashland Oil v. Arnett,* 875 F.2d 1271 (7th Cir.1989). In that case, the Seventh Circuit, following its decision in *Haroco,* 747 F.2d at 403 n. 22, held that a RICO conspiracy may involve a corporation and its employee. *Ashland Oil,* 875 F.2d at 1280–81. In *Ashland Oil,* the Seventh Circuit maintained its refusal to apply · *Copperweld* as it had done in *Haroco* because the court continued to believe that the purposes of RICO and the Section 1 of the Sherman Act were different. The Seventh Circuit subsequently applied this rule to a criminal case. *United States v. Crockett,* 979 F.2d 1204, 1218 & n. 12 (7th Cir.1992).

As indicated earlier, I am convinced that the Seventh Circuit's continued refusal to apply *Copperweld* to the RICO context is misplaced. The Seventh Circuit is surely correct in stating that the purposes of the Sherman Act and RICO are different. However, in my view, the difference is not important in the RICO conspiracy context, just as I believe it was not important in the RICO "person" and "enterprise" context.

It makes no sense to penalize a corporation by imposing conspiracy liability simply because it operates with a wholly owned subsidiary as opposed to operating in divisions. In a similar vein, it makes no sense to impose conspiracy liability upon a human being simply because he or she is employed by a corporation, particularly where, as here, there is only one human actor alleged to have been involved.

Once again, there is no reason to believe that the purposes of RICO which the Seventh Circuit evidently sought to foster—prevention of infiltration of legitimate businesses by racketeers and separating racketeers from their profits—would be furthered by adopting a doctrine that promotes form over reality. As the Supreme Court has said, "intra-enterprise conspiracy doctrine looks to the form of an enterprise's structure and ignores the reality." *Copperweld,* 467 U.S. at 772, 104 S.Ct. at 2742.

In summary, without clear direction from the United States Court of Appeals for the Eighth Circuit that *Copperweld* should not be applied to RICO conspiracies, I am unwilling to ignore *Copperweld* and conclude on the facts of this case that defendants Dain and Gourley can be found to have conspired with themselves or with the wholly owned subsidiary, DKQ–Muni. The motion for summary judgment must therefore be granted on this point.

IT IS ORDERED that the motion for summary judgment (Filing 87) is:

(1) denied, except as indicated below;

(2) granted to the extent that the court finds that the alternate enterprise consisting of Dain and DKQ–Muni cannot as a matter of law constitute an "enterprise" for purposes of RICO § 1962(c);

(3) granted to the extent that the court finds on the facts of this case that Dain and Gourley cannot be found to have conspired among themselves or with the wholly owned subsidiary, DKQ–Muni, for purposes of RICO § 1962(d).